# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ZOHAR CDO 2003-1, LLC; ZOHAR CDO 2003-1, LTD; ZOHAR II 2005-1, LLC; ZOHAR II 2005-1 LTD.; ZOHAR III, LLC; and ZOHAR III, LTD., | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | C.A. No. 12247-VCS |
| PATRIARCH PARTNERS, LLC; PATRIARCH PARTNERS VIII, LLC; PATRIARCH PARTNERS XIV, LLC; PATRIARCH PARTNERS XV, LLC, and PATRIARCH PARTNERS AGENCY SERVICES, LLC, | : : : : : : : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted: September 14, 2016
Date Decided: October 26, 2016

Kenneth J. Nachbar, Esquire and Thomas P. Will, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Michael Carlinsky, Esquire, Jonathan Pickhardt, Esquire, Ellison Ward Merkel, Esquire, Blair Adams, Esquire, and Jonathan Spital, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, Attorneys for Plaintiffs.

Gregory V. Varallo, Esquire, Robert W. Whetzel, Esquire, Sarah A. Galetta, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Robert M. Abrahams, Esquire, Taleah E. Jennings, Esquire, Kristie M. Blase, Esquire, Frank W. Olander, Esquire, Heidi G. Crikelair, Esquire, and Alexander H. Wharton, Esquire of Schulte Roth & Zabel LLP, New York, New York; and Reed Brodsky, Esquire of Gibson, Dunn & Crutcher LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Even discrete disputes between long-standing business associates quite often are not as straightforward as they first appear. The parties in this case have been in a business relationship for more than ten years. And, true to form, they have sought to expand litigation of a claim that was pled as a narrow, straightforward breach of contract into a vehicle through which they could air a wide range of grievances and cross-grievances, many of which raise serious questions regarding the *bona fides* of the structure of their complex relationship. Having now conducted a trial, and having reviewed the operative contracts that govern the parties' various relationships, I am satisfied that the dispute *sub judice* is, in fact, as straightforward as it first appeared. The claim as pled is that the defendants breached discrete provisions within the parties' operative contracts by failing to produce documents to the plaintiffs. The Court need not expand its focus beyond the unambiguous language of those contracts to resolve this claim. While it is clear the parties' broader disputes will go on long after this litigation is over, the resolution of those disputes will have to await another day.

Plaintiffs, the Zohar Funds (defined below), are special purpose vehicles that issue securities in the form of collateralized loan obligations secured by the funds' assets. Defendants, the Patriarch entities (defined below), separately or collectively, directly or through their owner, Lynn Tilton, acted in various capacities with respect to the Zohar Funds, including as equity holders and note

holders of the funds and as part owner, creditor, manager or board member of certain of the Zohar Funds' borrowers (referred to by the parties as "portfolio companies"). In addition, and particularly relevant here, from their inception through early 2016, Patriarch acted as the sole Collateral Manager to the Zohar Funds.

When relations between the parties began to sour, Patriarch resigned as Collateral Manager effective March 1, 2016. The Zohar Funds allege that Patriarch breached its obligations under various collateral management agreements to assist in the orderly transition to a new collateral manager by turning over certain documents. Patriarch denies that it is contractually bound to turn over documents to the new collateral manager but, in any event, contends that it has produced all documents in its possession that the new collateral manager needs to perform its collateral management function.

In the course of litigating this discrete controversy, the Zohar Funds have alleged and have sought to introduce evidence that Tilton has attempted to exploit the structure of the Zohar Funds and has abused her various roles with respect to the Zohar Funds for her sole benefit and to the detriment of the other investors. Patriarch, in turn, has alleged that the Zohar Funds have breached contractual obligations owed to Patriarch and are attempting improperly to shift responsibility for the Zohar Funds' poor performance from the controlling class of the funds,

who would otherwise bear sole responsibility, to Tilton and Patriarch. The extent to which Patriarch must produce documents during the transition from one collateral manager to another, however, is a discrete issue that is governed solely by discrete provisions within the contracts that govern the parties' relationships. The Court need not consider other aspects of the parties' relationship or the implications of broader aspects of the parties' various disputes with one another to resolve this narrow dispute.

For reasons explained below, I find that Patriarch is contractually obligated to produce to the Zohar Funds certain documents within its possession relating to the collateral it previously managed and its function as Collateral Manager. Having failed to produce these documents thus far, Patriarch is in breach of the contracts.

## I. FACTUAL BACKGROUND

To follow are my findings of fact based on the stipulations of the parties, documents which I have determined to be admissible evidence and testimony from seven fact witnesses and one expert witness presented during a two-day trial.[1]

---

[1] The testimony of witness Kris Talgo was presented only by deposition.

## A. The Parties

Plaintiffs and Counterclaim Defendants Zohar CDO 2003-1, LLC, Zohar II 2005-1, LLC and Zohar III, LLC are Delaware limited liability companies.[2] Plaintiffs and Counterclaim Defendants Zohar CDO 2003-1, Ltd. (together with Zohar CDO 2003-1, LLC, "Zohar I"), Zohar II 2005-1, Ltd. (together with Zohar II 2005-1, LLC, "Zohar II") and Zohar III, Ltd. (together with Zohar III, LLC, "Zohar III") are Cayman Islands exempted companies.[3] Zohar I, Zohar II and Zohar III (collectively, the "Zohar Funds") are separate collateralized loan obligation ("CLO") investment vehicles that issued and sold notes to investors for cash and used the proceeds to purchase a pool of assets to serve as collateral for the funds.[4]

Defendants and Counterclaim/Third-Party Plaintiffs Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners VIII, LLC ("Patriarch VIII"), Patriarch Partners XIV, LLC ("Patriarch XIV") and Patriarch Partners XV, LLC ("Patriarch XV") are Delaware limited liability companies.[5] Patriarch VIII, Patriarch XIV and Patriarch XV are affiliates of Patriarch Partners, LLC.[6] Until

---

[2] Pretrial Stipulation and Order ("PTO") 3,4 ¶¶ 1, 3, 5.

[3] *Id.* ¶¶ 2, 4, 6.

[4] *Id.* at 5 ¶ 13.

[5] *Id.* at 4–5 ¶¶ 7–10.

[6] *Id.* at 4 ¶ 7.

March 3, 2016, Patriarch VIII served as Collateral Manager for Zohar I, Patriarch XIV served as Collateral Manager for Zohar II and Patriarch XV served as Collateral Manager for Zohar III.[7]

Third-Party Defendant Alvarez & Marsal Zohar Management, LLC ("AMZM") is a Delaware limited liability company with a principal place of business in New York, New York. Effective March 3, 2016, AMZM was appointed as replacement Collateral Manager for each of the Zohar Funds.[8]

## B. Formation of the Zohar Funds

Zohar I was born out of a business relationship between Patriarch Partners and MBIA Insurance Corporation ("MBIA"). Patriarch Partners had managed a prior special purpose deal called Ark II on which MBIA had served as the monoline insurer, meaning it had insured the principal and interest due to noteholders in the case of a default by the issuer, Ark II. Monoline insurance serves not only to protect noteholders from default, but also to enhance the credit rating of the debt issue. For this reason, a monoline insurance company, such as MBIA, is frequently referred to as a "credit enhancer" for the debt issue.

---

[7] *Id.* at 4–5 ¶¶ 8–10. For ease of reference, unless otherwise indicated, I will refer to Patriarch VIII, Patriarch XIV and Patriarch XV collectively as "Patriarch."

[8] *Id.* at 7 ¶ 19.

Following the Ark II deal, MBIA approached Patriarch Partners and its CEO, Lynn Tilton, to find a solution for seven struggling collateralized debt obligations ("CDO") and CLOs (collectively, the "MBIA CDOs") on which MBIA had, by its own estimate, a total potential insurance exposure of $235 million.[9] The solution proposed by Tilton and Patriarch Partners was for Patriarch Partners, through an affiliate, to take over as collateral manager for the seven distressed deals and to create a new investment vehicle, Zohar I, which would raise new investment money and would purchase a separate pool of collateral.[10] As part of the Zohar I deal, MBIA was given Class B notes in Zohar I which would pay out after all of the Class A senior secured notes had been paid. The deal was structured in this manner to provide MBIA with upside potential in Zohar I so that it could be made whole for any amounts it was not able to reinvest or work out in the MBIA CDOs.[11] Affiliates of Patriarch Partners took over as collateral managers of the MBIA CDOs between October 2003 and March 2004.[12]

Zohar I launched in November 2003.[13] Patriarch VIII signed a Collateral Management Agreement among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1,

---

[9] Tr. 383 (Tilton).

[10] Tr. 384–85 (Tilton).

[11] Tr. 385 (Tilton).

[12] Tr. 391 (Tilton).

[13] PTO 5 ¶14.

LLC and Patriarch Partners VIII, LLC dated as of November 13, 2003 (the "Zohar I CMA") to serve as Collateral Manager.[14] Zohar I generated approximately $530 million from the sale of notes.[15]

Zohar II and Zohar III were created to raise additional capital which would allow the Zohar Funds greater access to larger and more diverse transactions.[16] Pursuant to an indenture (the "Zohar I Indenture"), dated as of November 13, 2003 between Zohar CDO 2003-1, Limited, Zohar CDO 2003-1, Corp., Zohar CDO 2003-1 LLC, MBIA Insurance Corporation, CDC Financial Products, Inc. and U.S. Bank National Association (the "Trustee"), Zohar I was limited in the amount of collateral it could hold from any single issuer.[17] Access to additional capital raised through Zohar II and Zohar III would not only allow the funds to engage in larger transactions, but would also serve a risk management function through increased diversification of the fund collateral.[18] Zohar II closed in January of 2005; Zohar III closed in April of 2007.[19]

---

[14] JTX-005 (Zohar I CMA).

[15] PTO 5 ¶ 14.

[16] Tr. 416 (Tilton).

[17] JTX-006 (Zohar I Indenture) ("[N]ot more than 3.0% of the Maximum Investment Amount may consist of obligations issued by any single issuer or any of its Affiliates . . . ."); Tr. 416-17 (Tilton).

[18] Tr. 416–17 (Tilton).

[19] PTO 5 ¶14; Tr. 418 (Tilton).

Patriarch XIV executed a Collateral Management Agreement on January 12, 2005, with Zohar II 2005-1, Limited, Zohar II 2005-1, LLC (the "Zohar II CMA") to serve as Collateral Manager of Zohar II.[20] Patriarch XV executed a Collateral Management Agreement on April 6, 2007, with Zohar III, Limited, Zohar III, LLC (the "Zohar III CMA") (collectively, with the Zohar I CMA and the Zohar II CMA, the "Patriarch CMAs"), to serve as Collateral Manager of Zohar III.[21] Each fund generated approximately $1 billion from the sale of notes.[22]

## C. The Relationship Between Patriarch Partners and MBIA Sours

By the terms of the Zohar I Indenture, MBIA was not only given upside potential in Zohar I in the form of subordinated Class B notes, but also insured the fund as credit enhancer.[23] MBIA also agreed to serve as credit enhancer for Zohar II pursuant to an indenture (the "Zohar II Indenture") dated January 12, 2005.[24] The first sign of any conflict between Patriarch Partners and MBIA surfaced when MBIA would not agree to serve as credit enhancer for Zohar III, pursuant to an indenture (the "Zohar III Indenture") (collectively with the Zohar I Indenture and the Zohar II Indenture, the "Zohar Indentures"), dated April 16,

---

[20] JTX-011(Zohar II CMA).

[21] JTX-019 (Zohar III CMA).

[22] PTO 5 ¶ 14.

[23] Zohar I Indenture §1.1.

[24] JTX-013 (Zohar II Indenture).

2007.[25] Tensions boiled over in 2009 when MBIA filed suit in federal court in New York claiming that Patriarch VIII had breach its agreements, including the Zohar I Indenture.[26] In 2011, while the litigation between MBIA and Patriarch VIII was still ongoing, Tilton, and by extension Patriarch Partners, began to sense that it might be best for all concerned if Patriarch stepped down as Collateral Manager.[27] Over the next few years, Tilton offered Patriarch's resignation as Collateral Manager several times but the offers were not accepted by the controlling classes as required under the Patriarch CMAs.[28]

In November of 2015, Zohar I defaulted on several of the notes it had issued.[29] A bankruptcy proceeding followed during which Tilton once again offered to have Patriarch resign as Collateral Manager.[30] On February 3, 2016, during a meeting between Tilton, representatives of MBIA as Controlling Party of Zohar I and Zohar II and representatives of the Zohar III Controlling Class, Tilton verbally tendered resignations on behalf of Patriarch as Collateral Manager of each

---

[25] JTX-020 (Zohar III Indenture); Tr. 428–29 (Tilton).

[26] *MBIA Ins. Corp. v. Patriarch P'rs, LLC & LD Inv., LLC*, 950 F.Supp. 2d 568 (S.D.N.Y. June 10, 2013).

[27] Tr. 431 (Tilton).

[28] Tr. 432 (Tilton).

[29] Tr. 432 (Tilton).

[30] Tr. 433 (Tilton).

9

of the Zohar Funds.[31] Two days later, on February 5, Tilton sent a separate letter on behalf of Patriarch to the relevant constituencies of each of the three Zohar Funds providing written notice of Patriarch's resignation as Collateral Manager effective March 1, 2016.[32] The letters referenced the ongoing litigation with MBIA dating back to 2009 as well as statements made in connection with the recent bankruptcy proceeding as evidence that it would be in the best interest of all interested parties for a transition to a new collateral manager to occur.[33]

### D. The Transition Period

In each of the letters of resignation, Tilton, on behalf of Patriarch, asked that the Controlling Class for each of the Zohar Funds notify Patriarch Partners when a replacement collateral manager was selected.[34] In the weeks that followed, Patriarch Partners contacted MBIA and other representatives of the Zohar Funds to remind them of the impending effective date of Patriarch's resignation as Collateral Manager and to inquire regarding the identity of Patriarch's replacement.[35] At first, the responses to Patriarch's inquiries were encouraging in

---

[31] MBIA served as Controlling Party of Zohar I and Zohar II. MBIA chose not to serve as credit enhancer for Zohar III and, therefore, did not represent the Controlling Class of Zohar III.

[32] JTX-047.

[33] *Id.*

[34] *Id.*

[35] *Id.*

that they acknowledged the looming resignation and assured Patriarch that the search for a replacement collateral manager was underway.[36] As the weeks went by, however, the responses to Patriarch took on a sharper tone, suggesting that the Controlling Classes were surprised by Patriarch's "sudden" decision to resign.[37] Tilton responded that Patriarch was confused by the Controlling Class' surprise since MBIA had taken the position during the Zohar I bankruptcy proceedings in November 2015 that it was prepared to terminate Patriarch as Collateral Manager for Zohar I and believed that Patriarch should be removed as Collateral Manager for all of the Zohar Funds.[38] In this same correspondence, Tilton advised MBIA that the portfolio companies were concerned regarding the delay in selecting a replacement collateral manager and reiterated Patriarch's readiness to comply with its transition responsibilities under the Patriarch CMAs.[39]

Patriarch did not learn that AMZM had been selected as the successor collateral manager until March 3, 2016, two days after Patriarch was to have resigned.[40] AMZM assumed its role as Collateral Manager by entering into a

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

11

series of Collateral Management Agreements for each of the three Zohar Funds, all of which were dated as of March 3, 2016.[41]

The first contact between AMZM and Patriarch was the next day, March 4, when Bryan Marsal, co-CEO of Alvarez and Marsal LLC ("A&M"), an affiliate of AMZM, wrote to Tilton requesting her assistance in the transition process and asking for a convenient time to meet with her and her staff.[42] Tilton responded via e-mail later that same day and told Marsal she would be available to meet the following week between Wednesday and Friday, March 9–March 11.[43] After exchanging thoughts regarding topic areas for discussion, the meeting was set for March 11.[44]

On March 7, Tilton contacted Marsal to express her concern over reporting for the month of March and suggested that it might be advisable for AMZM to delay the transfer date.[45] In response, Marsal designated Elizabeth LaPuma, Managing Director at A&M, and Kris Talgo, a Senior Director, as the two AMZM representatives who would be handling the reporting issues.[46] Tilton spoke with LaPuma and Talgo later that afternoon and, following the call, wrote them an email

---

[41] JTX-064; JTX-065; JTX-066.

[42] JTX-070.

[43] JTX-071.

[44] *Id.*

[45] JTX-072.

[46] *Id.*

in which she expressed Patriarch's view that AMZM had "been placed in an impossible position" by being forced to take over reporting responsibilities for the funds without "proper time, training, and information."[47] For a second time, Tilton suggested that it would be best to delay transfer of collateral management responsibilities through the current reporting period so that AMZM could shadow Patriarch and learn the job first-hand.[48] She requested approval from the Controlling Classes for a more gradual transition and offered to sit down with AMZM on March 9 to review processes and to turn over books and records.[49]

Less than two hours later, an employee from Tilton's office contacted LaPuma and Talgo to set up a meeting for March 9.[50] The day before that meeting, March 8, Marsal sent an email to LaPuma, Talgo, and Kelly Stapleton, a Managing Director of A&M, in which he described Tilton's overtures as an "olive branch" and emphasized that "baby steps need to be taken in building trust."[51] In a separate email on March 8, Talgo advised LaPuma and Marsal that Adam Katz from Patriarch had reported that Patriarch was "99% done on loading data onto a hard

---

[47] JTX-074.

[48] *Id.*

[49] *Id.*

[50] JTX-075.

[51] JTX-079.

drive for delivery tomorrow."[52] Talgo closed the email by observing that Katz "[w]as more than willing to answer any questions and go over any items we wish to discuss."[53] Later in the day, Katz followed up by sending Talgo some sample credit agreements and amendments.[54]

## E. Cooperation Ends

The first sign of trouble surfaced on the evening of March 8 when LaPuma advised Marsal and Talgo that Tilton's offer to allow A&M to shadow Patriarch actually contemplated that Patriarch would continue to be paid as Collateral Manager through the month of March.[55] LaPuma went on to express her view that the Controlling Classes likely would not consent to Patriarch remaining as Collateral Manager, particularly if they were going to be expected to pay Patriarch another $4 million in fees.[56] LaPuma was correct; the Controlling Classes took the position that Patriarch was required by the Patriarch CMAs to assist in the transition, including by turning over the books and records of the Zohar Funds, and that no further payment to Patriarch was required.[57]

---

[52] JTX-081; Tr. 58 (LaPuma).

[53] JTX-081; Tr. 58 (LaPuma).

[54] JTX-082; JTX-83; JTX-084; Tr. 59 (LaPuma).

[55] JTX-085.

[56] *Id.*

[57] *Id.*

The meeting between Patriarch and AMZM went forward on March 9 as scheduled. The following day, LaPuma detailed the highlights of the two hour meeting with Tilton and her employees in an e-mail to Marsal.[58] LaPuma reported that Tilton had provided her with a flash drive containing "many of the initial documents we need to get going."[59] She also reported that Tilton was no longer pushing to stay on as Collateral Manager during the current reporting period.[60] Tilton had declined to provide internal Patriarch documents regarding its financial reporting infrastructure or its methodology for waterfall calculations citing liability concerns, but did offer to have her employees walk AMZM through the waterfall calculation.[61] Although LaPuma felt Tilton had provided many of the initial documents that AMZM needed to get started as Collateral Manager, she did note, with prescient reserve, that Tilton had declined to provide "equity documents." LaPuma explained that Tilton had described "two buckets of equity"; "equity that is collateral for which we will hopefully get information" and "equity she controls through LLC interests over which she has complete control, with the trusts potentially getting some value if and when the Company is sold."[62] LaPuma

---

[58] JTX-095.

[59] *Id.*

[60] *Id.*; Tr. 71–72 (LaPuma).

[61] JTX-095; Tr. 72 (LaPuma).

[62] JTX-095; Tr. 72–73 (LaPuma).

indicated that she and Talgo asked for a sample LLC agreement to illustrate the second type of equity which Tilton said she would provide.[63] LaPuma concluded her report of the meeting by noting "[w]e will obviously need to dig deeper on [the equity] subject, but that's for later."[64]

During the second half of March, Patriarch and AMZM continued to communicate about transition issues while AMZM employees digested the documents that Patriarch had provided thus far. Internally AMZM began to "log [] financial [] information we have and do not have."[65] LaPuma expressed her concern to Marsal that "we do not even have a list of everything we own . . ."[66] She continued, "[w]e are trying to get a complete initial set of documents for each investment."[67] She noted that Scott Whalen, a credit analyst at Patriarch Partners, had initially offered to provide more updated financials for the portfolio companies, but she found it "a bit concerning" that Whalen had since gone "radio silent."[68]

All of these concerns and questions came to a head on March 22, when Marsal emailed Tilton stating that as the Collateral Manager for the Zohar Funds,

---

[63] JTX-095.

[64] *Id.*

[65] JTX-096.

[66] JTX-110.

[67] *Id.*; Tr. 14–15 (LaPuma).

[68] JTX-110.

AMZM needed to receive "Patriarch's comprehensive collateral manager books and records" and referencing several areas where AMZM felt that information was missing or needed to be explained or supplemented.[69] Adam Katz replied two days later in a letter which clearly signaled a change in the tone of the communications between the parties. Katz's letter began: "at the outset Patriarch has, in fact, provided A&M with its comprehensive collateral manager books and records as of March 2, 2016."[70] He continued, "[w]e have no obligation to prepare charts, lists, summaries, synopses or corporate histories for you and decline to do so."[71] He then addressed AMZM's itemized requests and explained how, in Patriarch's view, everything that AMZM had requested either had already been provided or could readily be obtained by AMZM from other sources.[72]

The next day, March 25, LaPuma responded on behalf of AMZM with a series of follow-up questions. Importantly, she questioned how Patriarch was defining the term "collateral" and expressed AMZM's view that the term "collateral" as referenced in the Zohar Indentures includes all of the Zohar Funds'

---

[69] JTX-133.

[70] JTX-138.

[71] *Id.*

[72] *Id.*

17

debt and equity investments.[73] Based on this understanding, she again requested a "complete list of collateral including any equity interests of the funds . . ."[74]

On March 30, Marsal once again wrote to Tilton, this time in a formal letter, claiming that AMZM still had not received the information necessary to know the collateral that it was managing or the rights and obligations associated with that collateral.[75] That same day, Marsal also sent an email to Katz, with whom LaPuma had been corresponding, expressing concern over the lack of a response regarding financials and collateral.[76] On April 1, Tilton responded in a letter that removed all doubt that the relationship between AMZM and Patriarch had turned. After suggesting that AMZM was, in essence, asking Patriarch to do AMZM's job, Tilton staked Patriarch's final position that it had fully complied with its obligation to turn over all of the books and records relating to the Zohar Funds that AMZM needed to perform its function as Collateral Manager.[77] Tilton closed her correspondence by stating that she had directed her employees to respond to LaPuma's most recent list of questions and making it clear that "this will be our

---

[73] JTX-139.

[74] *Id.*

[75] JTX-151.

[76] JTX-152; Tr. 468–69 (Tilton).

[77] JTX-158.

final act" and "[t]he time has now come for you to sink or swim on your own."[78]

Despite Tilton's letter, AMZM and Patriarch continued to correspond through the month of April, albeit not productively.[79]

## F. Litigation Begins

The Zohar Funds initiated this action on April 22, 2016. They filed an Amended Verified Complaint on May 9, 2016 adding Patriarch Partners Agency Services, LLC ("PPAS"), an agent of the Zohar Funds under certain credit agreements, as a defendant. The next day, the Zohar Funds moved for expedition.[80] Patriarch then moved to dismiss or stay this action in favor of a related action filed in New York. On May 27, 2016, the Court granted the Zohar Funds' motion for expedition and denied Patriarch's motion to dismiss or stay.[81] On the eve of trial, the parties filed cross-motions for partial summary judgment on

---

[78] *Id.*

[79] JTX-160; JTX-165; JTX-168; JTX-174; JTX-179; JTX-180.

[80] The Zohar Funds' motion for expedition was based, to a great extent, on the irreparable harm that the Zohar Funds would suffer if they were unable to receive the documents they needed to understand and manage their Collateral in time to devise a plan to avoid or to minimize the impact of the potential default of $750 million in Zohar II notes which mature in January 2017.

[81] The Court did dismiss the Zohar Funds' claims relating to Patriarch's document production obligations under thirty-six credit agreements since those agreements contained exclusive New York choice of forum provisions. Thereafter, the Court dismissed claims arising under an additional fifteen credit agreements upon determining that they did not oblige Patriarch to produce documents under New York agency law. Shortly before trial, Plaintiffs withdrew their claims against PPAS under all remaining credit agreements leaving only the claims for documents under the Patriarch CMAs for trial.

the issue of whether Patriarch was required under the Patriarch CMAs to turn over any documents to the Zohar Funds and AMZM. The Court deferred ruling on the cross- motions until after trial.

## II. LEGAL ANALYSIS

The cross-motions for summary judgment call the threshold question of whether the Patriarch CMAs require Patriarch to produce any documents to the Zohar Funds upon the termination of its services as Collateral Manager.[82] The answer to this question is revealed by a relatively straightforward exercise of contract construction that is not confounded by disputed facts.[83] As explained below, I am satisfied that the clear and unambiguous terms of the Patriarch CMAs require Patriarch to produce certain book and records relating to the Collateral of the Zohar Funds so that AMZM can function as successor Collateral Manager.

Before turning to the construction of the Patriarch CMAs that will drive the Court's analysis here, both with respect to the cross-motions for summary

---

[82] I note that Patriarch appears to have shifted its position regarding whether the Patriarch CMAs require the outgoing collateral manager to produce documents. Indeed, Patriarch acknowledged its obligation to produce documents more than once following the delivery of its resignation notice. *See* JTX 158, 179, 180, 189, 203. Whatever caused Patriarch to alter its view regarding the scope of its post-resignation contractual obligations does not matter. As discussed below, Patriarch's obligations are defined by the clear and unambiguous terms of the Patriarch CMAs.

[83] *See Demetree v. Comm. Trust Co.*, 1996 WL 494910, at *1 (Del. Ch. Aug. 27, 1996) (Allen, C.) (granting one party's motion for summary judgment, denying the other party's cross-motion for summary judgment and ordering specific performance of a clear and unambiguous contract upon determining that there were no "disputes as to the material facts" under Court of Chancery Rule 56).

judgment and the trial issues, I pause for a moment to return to where I started. This case is a straightforward breach of contract case, nothing more and nothing less.[84] The contracts at issue here are the products of arms-length bargaining between highly sophisticated parties. It is rare that even sophisticated scriveners capture all that a court might like to see in a document to reveal the objective meaning of disputed terms. This case is no exception. Even so, I am satisfied that the Patriarch CMAs are clear and unambiguous and may be construed by reference only to the terms that appear within their four corners. I need not and will not consider the competing extrinsic evidence offered by the parties.

## A. The Patriarch CMAs Require Patriarch to Produce Books and Records to the Zohar Funds or Its Representative

The Patriarch CMAs are governed by New York law.[85] Delaware and New York share the view that "[i]nterpretation of an unambiguous contract provision is

---

[84] As noted, I am fully aware that the parties have more on their minds here than a dispute over the production of books and records. Patriarch believes that the Zohar Funds are acting at the behest of MBIA, who they claim is attempting to push responsibility for the impending default of Zohar II onto Patriarch in the wake of MBIA's public announcement that it may not be able to meet its obligation to insure the Zohar II notes. Defs.' Post-Trial Br. at 27 n.18. For their part, the Zohar Funds maintain that Patriarch's reluctance to comply with its production and inspection obligations is driven by a desire to conceal what Defendants characterize as the "myriad, often conflicting roles" played by Patriarch Partners, and in particular Tilton, in the management of the Zohar Funds. Post-Trial Br. of the Zohar Entities ("Pls.' Post-Trial Br.") at 2. While these issues no doubt have animated the parties' litigation positions here, none of these issues are before the Court and none will be addressed or resolved by the Court. Nothing in this decision should be construed as a reflection that I have formed any view whatsoever regarding the parties' broader dispute.

[85] Zohar I CMA §7.5; Zohar II CMA §7.5; Zohar III CMA §7.4.

a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument."[86] In other words, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole."[87] Following traditional principles of contract interpretation, "words and phrases used by the parties must . . . be given their plain meaning."[88] A contractual provision is unambiguous if, on its face, the provision is "reasonably susceptible of only one meaning."[89] And a contract is not ambiguous "simply because one of the parties attaches a different, subjective meaning to one of its terms."[90]

---

[86] *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986) (quoting *Teitelbaum Hldgs., Ltd. v. Gold*, 396 N.E.2d 1029, 1032 (N.Y. 1979)). *See also Pellaton v. Bank of New York*, 592 A.2d 473, 478-79 (Del. 1991) (same).

[87] *Ellington v. EMI Music, Inc.*, 21 N.E. 3d 1000, 1003 (N.Y. 2014).

[88] *Id.*

[89] *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.,* 951 N.Y.S.2d 19, 24 (N.Y. App. Div. 2012).

[90] *Sasson v. TLG Acq. LLC,* 9 N.Y.S.3d 2, 4 (N.Y. App. Div. 2015).

## 1. Section 5.7 of the Patriarch CMAs

According to the Zohar Funds, Section 5.7 of the Patriarch CMA, entitled "Action Upon Termination," is one source of Patriarch's document production obligation.[91] It reads in relevant part:

> From and after the effective date of the termination of the Collateral Manager's duties and obligations pursuant to this agreement or removal of the Collateral Manager hereunder . . . . the Collateral Manager shall as soon as practicable: (i) deliver to the Company or (at the direction of the Company) any successor collateral manager that is appointed all property and documents of the Trustee, the Company, the Co-Issuer, or the Zohar Subsidiary, as the case may be, relating to the Collateral then in the custody of the Collateral Manager. . .

The Zohar Funds argue that this provision plainly and unambiguously requires Patriarch to "deliver" to the Zohar Funds or AMZM "all property and documents" of the Zohar Funds "relating to the Collateral" immediately upon the "termination" of Patriarch's "duties and obligations" under the Patriarch CMAs. Patriarch counters that this construction is not reasonable because Patriarch was not "terminated" as Collateral Manager under the Patriarch CMAs; it voluntarily resigned.[92]

After carefully considering the terms of Section 5.7, I am satisfied that the Zohar Funds' construction of the provision is the only reasonable construction.

---

[91] The relevant provision is §5.7 in the Zohar I CMA and Zohar II CMA and §5.6 in the Zohar III CMA. Because the language is identical in all three agreements, however, I will refer only to §5.7 to avoid confusion.

[92] Defs.' Post-Trial Br. at 32.

While it is correct, as Patriarch points out, that Section 5.7 references "termination" of the Collateral Manager "pursuant to this agreement," which Patriarch contends refers to Sections 5.2 and 5.3 describing grounds for removal of the Collateral Manager, Section 5.7 also addresses Patriarch's obligations upon "termination of [its] duties and obligations" under the agreement, which is precisely what happened when Patriarch tendered its resignation as Collateral Manager. At the moment the Zohar Funds accepted Patriarch's resignation, the parties understood that Patriarch's "duties and obligations" under the Patriarch CMA would "terminate" upon the effective date of its resignation.[93] To construe Section 5.7 otherwise would be to render the "termination" language "nugatory."[94] Patriarch has failed to explain how a "practical interpretation" of Section 5.7 would require Patriarch to deliver to the Zohar Funds records relating to the Collateral after Patriarch had been removed (terminated) as Collateral Manager but would not require Patriarch to do so after Patriarch resigns as Collateral Manager and thereby terminates its services.[95] Patriarch's proffered construction of Section 5.7 is not reasonable.

---

[93] *See* Zohar I CMA §5.5(b); Zohar II CMA §5.5(b); Zohar III CMA §5.4(a).

[94] *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S. 2d 174, 177 (N.Y. App. Div. 1995).

[95] *Ellington,* 21 N.E. 3d at 1003. *See also Sasson v. TLG Acq. LLC,* 9 N.Y.S.3d 2, 4 (N.Y. App. Div. 2015) (holding that a contract is not rendered ambiguous simply because

## 2. **Section 6.3 of the Patriarch CMAs**

The Zohar Funds allege that Patriarch has also breached its document production obligations under Section 6.3 of the Patriarch CMAs. That provision reads in relevant part:

> The Collateral Manager, with the assistance of the Collateral Administrator, shall maintain appropriate books of account and records relating to services performed hereunder and relating to the Collateral including invoices for professional fees, and such books of account and records shall be accessible for inspection by a representative of the Company, the Zohar Subsidiary, the Trustee, the Credit Enhancer, the Preference Share Paying Agent, the Holders of the Notes and the independent accountants appointed by the Company pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior written notice; provided, however, that following the Collateral Manager's receipt of a notice of its removal pursuant to Section 5.3 hereof, the Collateral Manager shall at the request of the Controlling Party use its commercially reasonable efforts to promptly provide to the prospective successor collateral manager copies of the books and records of the Zohar Obligors and copies of Underlying Instruments (in each case in the possession of the Collateral Manager) (for the avoidance of doubt, such books and records and other information shall not include the credit templates or other proprietary information of the Collateral Manager); provided further that the Collateral Manager shall be required to provide the information described in the immediately preceding proviso if (i) the prospective successor collateral manager executes a confidentiality agreement reasonably acceptable to the Collateral Manager and (ii) the release of such information is permitted under the Transaction Documents and the Underlying Instruments. Upon the termination of its obligations hereunder in accordance with this Agreement and the Indenture, the Collateral Manager agrees to either (i) maintain or cause the Collateral Administrator to maintain, such books and records as provided above

one party ascribes a different "subjective meaning" to otherwise clear and unambiguous terms).

for a period of three years (or such longer period required by applicable law) from such termination or (ii) deliver, or cause the Collateral Administrator to deliver, all such books and records (or copies thereof) to the Trustee promptly following such termination.

Section 6.3 imposes three obligations upon the Collateral Manager with respect to books and records relating to the Zohar Funds. First, the Collateral Manager is to maintain appropriate books of account and records relating to its collateral management services and the Collateral. Second, the Collateral Manager is to allow for inspection of these books and records by the Zohar Funds or their representative, in this case AMZM. This right of inspection is conditioned on the receipt of written notice of a demand for inspection by the Collateral Manager. The right of inspection converts to an obligation on the part of the Collateral Manager to produce specifically designated documents under specifically designated conditions in the event the Collateral Manager is removed for cause. Third, upon termination of the Collateral Manager's obligations under the Patriarch CMAs, the Collateral Manager will "maintain or cause the Collateral Administrator to maintain, such books and records as provided above for a period of three years (or such longer period required by applicable law) from such termination or deliver, or cause the Collateral Administrator to deliver, all such books and records (or copies thereof) to the Trustee promptly following such termination."

26

The Zohar Funds focus on the first and second of Patriarch's three obligations under Section 6.3 and contend that Patriarch is obliged to maintain "books of account and records relating to [the services it provided under the Patriarch CMAs] and the Collateral" and to make such "books of account and records accessible for inspection by a representative of the [Zohar Funds]. . . ."[96] This focus seems to be well-placed as Section 6.3 does appear to require Patriarch to maintain "books of account and records relating to [Patriarch's] services performed hereunder and relating to the Collateral" and to grant the Zohar Funds or its representatives a clear right of inspection.[97] Patriarch argues, however, that the right of inspection is not so clear cut because, as it reads Section 6.3, the obligations to maintain books of account and records and to make them accessible for inspection apply only to a current Collateral Manager and not a former Collateral Manager. Under this construction, Patriarch's obligation to maintain books and records ended when Patriarch resigned.

Patriarch's interpretation of Section 6.3 might carry the day if that provision was construed in a vacuum. But that is not how contract construction works. Rather, the Court must view all of the provisions of the contract together and give

[96] Pls.' Post-Trial Br. at 20–21.

[97] The third document production obligation in Section 6.3 requires Patriarch to deliver books and records to the Trustee, not the Zohar Funds or AMZM.

effect to all terms.[98] Patriarch's interpretation of Section 6.3 ignores Section 5.6 of the Patriarch CMAs.[99] That section, entitled "Survival," states that "[u]pon any termination or assignment of this Agreement, the provisions of Sections . . . 5.7 [and] 6.3 . . . shall survive such termination or assignment and remain operative and in full force and effect." Therefore, the obligations in both Sections 5.7 and 6.3 expressly survive termination of the Patriarch CMAs and remain "in full force and effect." Patriarch's attempts to reconcile Section 5.6 and Section 6.3 falls short.[100] While it is true that the fundamental obligations set forth in Section 6.3 are not altered by Section 5.6, the extent to which these obligations survive termination clearly is governed by Section 5.6. The only reasonable construction of Sections 5.6 and 6.3 is that Section 6.3 survives the termination of Patriarch's service as Collateral Manager. To hold otherwise would be to ignore the survival provision altogether.[101]

---

[98] *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S. 2d 174, 177 (N.Y. App. Div. 1995) ("An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation.").

[99] The relevant provision is §5.6 in the Zohar I CMA and Zohar II CMA and §5.5 in the Zohar III CMA. I will refer only to §5.6 to avoid confusion.

[100] Post-Trial Arg. at 79–80 ("5.6 which is the survival clause, I don't think changes the fundamental language in the other provisions that are preserved.").

[101] *Brad H. v. City of New York,* 951 N.E.2d 743, 746 (N.Y. 2011) ("To determine whether a writing is unambiguous, language should not be considered in isolation because the contract must be considered as a whole."); *Pearce, Urstadt, Mayer & Greer Realty Corp. v. Atrium Dev. Assocs.*, 571 N.E.2d 60, 64 (N.Y. 1991) ("[R]eading the agreement as a single integrated contract and giving effect to all its provisions—as [courts] are obliged to do—[courts] cannot and should not accept an interpretation that

The Zohar Funds' demand for documents is supported both by Section 5.7 and Section 6.3. Either provision of the Patriarch CMAs provides a separate, independent basis to require Patriarch to produce documents.[102]

### 3. Patriarch's Defenses to Specific Performance

In addition to offering strained constructions of Sections 5.7 and 6.3 to avoid its document production obligations, Patriarch has advanced three threshold defenses that it contends prevent an award of specific performance of these provisions or, at least, the broad specific performance the Zohar Funds seek here. For the reasons that follow, I disagree.

*First*, Patriarch contends that the Court must take into account the Zohar Funds' purpose in seeking books and records before ordering production.[103] Patriarch points to 8 *Del. C.* § 220 by analogy and notes that "Delaware courts recognize that books and records provided under Section 220 are not 'open-ended'

---

ignores the interplay of the terms, renders certain terms 'inoperable,' and creates a conflict where one need not exist.").

[102] Because I conclude that the plain and unambiguous language of Section 5.7 requires Patriarch to produce the documents and property of the Zohar Funds related to the Collateral, and the plain and unambiguous language of Section 6.3 requires Patriarch to make the books of account and records related to its collateral management services and the Collateral accessible for inspection, Patriarch's motion for summary judgment is denied and the Zohar Funds' cross-motion for partial summary judgment is granted.

[103] Defs.' Pretrial Br. at 22.

and should be interpreted based on the underlying purpose."[104] In response, the Zohar Funds cite case law of this Court which stands for the proposition that a court will not read a proper purpose requirement into a contractual obligation to produce books and records when the contract is otherwise silent with respect to the permitted purpose of a books and records demand.[105]

This is not a Section 220 case; it is a breach of contract case. If the parties wished to qualify the purposes for which the Zohar Funds could require Patriarch to produce books and records, they could have and presumably would have done so. In the absence of such language in the operative provisions, I see no basis to write it into the agreements or imply it here.[106]

*Second*, Patriarch argues that because the Zohar Funds failed to perform under the Patriarch CMAs, by failing to pay for collateral management services previously rendered, Patriarch's obligation to perform is excused under New York law. On this point, I note that this issue—the extent to which payment has been

[104] *Id.* (citing *Carapico v. Phila. Stock. Exch., Inc.*, 791 A.2d 787, 792-93 (Del. Ch. 2000)).

[105] Pls.' Post-Trial Br. at 22 n.7 (citing *Madison Real Estate Immobilien-Anlagegesellschaft Beschrankt Haftende Kg v. Kanam USA XIX Ltd. P'ship*, 2008 WL 1913237, at *13 (Del. Ch. May 1, 2008); *Wall Props. MLP v. Vanta Commercial Props. LLC*, 2015 WL 298294, at *2 (Del. Ch. Jan. 22, 2015)).

[106] Nor will I condition Patriarch's document production obligation on what Patriarch contends AMZM requires "to manage the Zohar Funds' Collateral." *See* Defs.' Post-Trial Br. at 7. *See also*, *id.* at 12, 14, 26, 39 (arguing that AMZM has all the documents it needs to perform as Collateral Manager.). The Patriarch CMAs impose no such condition.

wrongfully withheld from Patriarch—is squarely before a court in New York.  The issue was not tried before me and I have no basis in this record to conclude one way or the other whether the Zohar Funds have wrongfully withheld payment from Patriarch for services rendered under the Patriarch CMAs.[107]

*Third,* Defendants contend that their obligation to produce documents under the Patriarch CMAs was not a "material" obligation and, therefore, the Court has no authority to order specific performance of either Section 5.7 or Section 6.3.  A breach of contract will be deemed "material" under New York law if it "substantially defeat[s] the purpose" of the agreement.[108]  The primary purpose of the Patriarch CMAs is to facilitate management of the substantial and diverse Collateral of the Zohar Funds.  The Patriarch CMAs recognize that Patriarch may cease providing collateral management services under various scenarios and they provide the means by which those services will be transitioned to a successor

---

[107] Patriarch agreed to defer prosecution of its counterclaim until after its document production obligation under the Patriarch CMAs was litigated. Moreover, I note that Patriarch's  counterclaim was not included in the Pretrial Stipulation and Order as an issue of fact or law to be litigated in this action and Patriarch's statement for relief in the Pretrial Stipulation and Order requested only that the Court dismiss the Zohar Funds' claims.  PTO 13–14 ¶¶1–4,  15 ¶¶1–3.

[108] *See Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284 (2d Cir. 1997) ("Under New York law, for a breach of a contract to be material, it must 'go to the root of the agreement between the parties.'") (internal citations omitted).  *See also Wechsler v. Hunt Health Sys., Ltd.*, 330 F.Supp. 2d 383 (S.D.N.Y. 2004) (noting "a material breach is a breach that . . . 'is so substantial that it defeats the object of the parties in making the contract.'") (internal citations omitted).

collateral manager, including through the orderly transmittal of books and records relating to the Zohar Funds' Collateral and other aspects of the Collateral Manager's services. To characterize this transition process as "immaterial" is simply not credible. I suspect if the shoe was on the other foot, Patriarch would agree.

## B. Categories of Documents to be Produced

Having determined that the clear and unambiguous terms of the Patriarch CMAs require Patriarch to produce documents even after its resignation as Collateral Manager, I turn now to the scope of its document production obligation. Because Patriarch is required to produce property and documents of the Zohar Funds "relating to Collateral," per Section 5.7, and to make accessible for inspection "books of account and records relating to services performed [under the Patriarch CMAs] and relating to the Collateral," per Section 6.3, a determination of the scope of documents to be produced is necessarily dependent on the definition of "Collateral." The Patriarch CMAs incorporate the definition of Collateral within the Zohar Indentures:

> [a]ll money, instruments, accounts, payment intangibles, general intangibles, letter-of-credit rights, chattel paper, electronic chattel paper, deposit accounts, investment property and other property and rights subject or intended to be subject to the lien of this Indenture for the benefit of the Secured Parties as of any particular time pursuant to the Granting Clauses of this Indenture.

In other words, Collateral is anything that the Zohar Funds owns, or might own in the future based on current rights, that could be used to satisfy the Zohar Funds' obligations to noteholders. Importantly, however, the document production obligations set forth in the Patriarch CMAs are not limited to documents that themselves represent or evidence Collateral. The documents captured within Sections 5.7 and 6.3 also include all property and books of account and records "relating to Collateral." Not surprisingly, New York courts interpret "relating to" broadly in keeping with the dictionary definition of the phrase.[109]

Since the parties elected to impose a broad document production obligation upon Patriarch upon the termination of its services under the Patriarch CMAs, it is appropriate that Patriarch be compelled to produce not only documents that reflect or evidence the Collateral but also documents that are "connected" to the Collateral in some "established or discoverable" sense. With this in mind, in the absence of any temporal restriction in either Section 5.7, Section 6.3 or the definition of Collateral within the Zohar Indentures, I cannot agree with Patriarch that its document production obligation is limited to documents relating only to current

---

[109] *See HMS Hldgs. Corp. v. Moiseenk*, 49 Misc.3d 1215, at * 4 (N.Y. Sup. 2015) ("To arise out of . . . generally indicates a causal connection, whereas the phrase 'relating to' is defined more broadly to simply mean 'connected by reason of an established or discoverable relation'") (quoting *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001) (Sotomayor, J.) (citing Webster's (Third) New International Dictionary at 1916 (1986)).

holdings. Rather, I conclude that Patriarch must produce documents that relate to historical holdings of Collateral as well.

Patriarch has maintained throughout this litigation that it would be willing to produce certain documents if the Zohar Funds and AMZM agree to enter into a standard confidentiality agreement with respect to such documents. Patriarch has been unable, however, to tie any such condition on the production of documents to any language in the Patriarch CMAs or the related documents. As noted, Patriarch's obligation to produce documents is a contractual obligation. It cannot alter or modify that obligation after the fact simply because it does not like the deal it struck in the first instance.[110] I decline to condition Patriarch's production of the documents it is required to produce under the Patriarch CMAs on the execution of a confidentiality agreement for the simple reason that no such obligation appears in the contract.

There is one final issue to address regarding the scope of production before addressing the specific categories of documents the Zohar Funds have identified as

---

[110] "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *RE/MAX of New York, Inc. v Energized Realty Gp., LLC*, 24 N.Y.S. 3d 176, 178 (N.Y. App. Div. 2016). This of course is just as true in a situation in which one party, in hindsight, thinks it could have negotiated a better deal. I note that the parties knew how to impose the condition of a confidentiality agreement on Patriarch's document production obligation when that is what they intended. Patriarch's obligation to produce documents under Section 6.3 following its removal as collateral manager is conditioned upon the "prospective successor collateral manager execut[ing] a confidentiality agreement reasonably acceptable to [Patriarch]."

still missing from Patriarch's production: whether Patriarch must produce documents that reflect its own internal and proprietary work product even if that work product "relates to" to the Collateral? Fortunately, I need not undertake a dissection of the Patriarch CMAs or related documents to resolve this issue since the parties appear to agree on the outcome. The Zohar Funds are not seeking "proprietary or internal analyses or assessments."[111] In fact, they acknowledge that the line between what is property and documents of the Zohar Funds and internal work product of Patriarch is "the distinction . . . between analysis and ministerial work."[112] Thus, Patriarch need not produce internal and proprietary work product. Similarly, Patriarch need not produce privileged documents.[113]

I turn now to the specific categories of documents the Zohar Funds have requested from Patriarch to determine (1) whether they fall within the scope of documents that must be produced under the Patriarch CMAs; and (2) whether the Zohar Funds carried their burden of proving that Patriarch has breached its contractual obligation to produce such documents. In the conclusion of this decision, the Court will provide guidance for an implementing order to be submitted on notice by the Zohar Funds that will address the timing and means by

---

[111] Pls.' Post-Trial Br. at 18.

[112] Post-Trial Arg. at 7.

[113] *Cmty. Serv. Soc. v. Welfare Inspector Gen.*, 398 N.Y.S.2d 92, 95 (N.Y. Sup. 1977) ("To constitute a waiver there must be a clear relinquishment of a known right.").

which documents must be produced and will serve as the Court's final judgment on the Zohar Funds' claims.

### 1. Debt Documents

Patriarch does not dispute that documents which evidence the outstanding loan agreements and amendments to these agreements should be produced.[114] Credit agreements and amendments to those agreements exist for all of the portfolio companies of the Zohar Funds and they are stored on a Patriarch Partners' drive (the "P drive").[115] Patriarch maintains that any failure to produce these documents was "inadvertent."[116] In any event, all credit agreements or amendments that have not been produced must be produced in accordance with the implementing order.

### 2. Equity Documents

The parties focused much of their energy before, during and after the trial grappling over the different types of equity that are connected to the Zohar Funds and the types of documents that might relate to such equity holdings. After much debate, it appears that the parties agree that the Zohar Funds do hold interests in

---

[114] Post-Trial Arg. at 85 ("The first category, debt documents, I think we're all in agreement that those are documents that should be turned over. . .").

[115] Tr. 106–107 (Whalen).

[116] Post-Trial Arg. at 85.

certain types of equity securities, [117] "equity kickers" [118] and "equity workout securities" [119] as Collateral. [120] Equity kickers, of which there were several

[117] The Zohar Indenture defines "Equity Security" as: "(a) Any Equity Kicker, (b) any Equity Workout Security, (c) any equity security (including any equity security attached to an Unrestricted Collateral Debt Obligation) purchased with funds on deposit in the Unrestricted Collateral Account and (d) any other security that does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal, including those received by the Issuer or the Zohar Subsidiary, as applicable, as a result of the exercise or conversion of an Equity Kicker or other convertible or exchangeable Collateral Debt Obligation or Unrestricted Collateral Debt Obligation. No Equity Security other than an Equity Kicker or an Originated Special Loan/Preferred Security that is a Preferred Security may be purchased by the Issuer or the Zohar Subsidiary (other than (i) in connection with a workout or restructuring of an Obligor, its Affiliates, or the lines of business of the Obligor, or its Affiliates, or, subject to Section 7.8(a)(v), any Collateral Debt Obligation or Unrestricted Collateral Debt Obligation or (ii) subject to Section 7.8(a)(v), with proceeds from the Unrestricted Collateral Account). For the avoidance of doubt, a PIK Loan is not an Equity Security." Zohar I Indenture; Zohar III Indenture; Zohar III Indenture at §1.1.

[118] The Zohar Indenture defines "Equity Kicker" as: "Any Equity Security or any other security that is not eligible for purchase by the Issuer but is received with respect to a Collateral Debt Obligation or purchases as part of a 'unit' with a Collateral Debt Obligation." Zohar I Indenture; Zohar III Indenture; Zohar III Indenture at §1.1.

[119] The Zohar Indenture defines "Equity Workout Security" as: "Any security received in exchange for or in connection with a Collateral Debt Obligation or Unrestricted Collateral Debt Obligation, which security does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal." Zohar I Indenture; Zohar III Indenture; Zohar III Indenture at §1.1.

[120] Post-Trial Arg. at 87 ("The second category, equity documents, or equity-related documents, there's two categories there; equity that Patriarch contends is collateral and is permissible to be collateral under the indentures, and those documents have been produced."); Tr. 398–399 (Tilton) ("Two are permitted under the indentures, and one can hold them in the funds but you can't pay for them. And in the indenture, they're defined, and one is an equity kicker, which I will explain. And the other is a workout security that can be equity."); Tr. 541 (Tilton) (if equity is listed in the Trustee report, "it should be Collateral."); *see also*, Zohar I CMA; Zohar II CMA; Zohar III CMA at §§2.2(b), 2.2(c), and 2.2(d) (addressing Collateral Manager's obligations to acquire Collateral, enter into

described at trial, are evidenced in the terms of the credit agreements reflecting loans to portfolio companies.[121] One type of equity kicker was described as a "pay-off amount."[122] For this equity kicker, as consideration for the extension of a loan, the underlying credit documents would include terms that required an extra payment to the Zohar Funds if and when the loan was paid off.[123] Another example of an equity kicker would be warrants that are given to the Zohar Funds under the terms of the underlying credit agreement that could be converted into equity if the portfolio company went public.[124] A special type of equity kicker was described as a preferred loan origination security.[125] This equity kicker was

---

agreements with respect to Collateral and any "Equity Security" and negotiate with prospective sellers or issuers of Collateral.).

[121] Tr. 399 (Tilton) ("[Equity kicker] could come in many different forms as long as it was attached to the loan.").

[122] Tr. 399 (Tilton).

[123] Tr. at 399–400 (Tilton).

[124] Tr. at 400 (Tilton).

[125] Tr. at 407 (Tilton). In the Zohar II and Zohar III Indentures, this so-called "Originated Special Loan/Preferred Security" is defined as: "Any loan or other debt obligation or Preferred Security that (i) was acquired by the Issuer and/or the Zohar Subsidiary in connection with the origination of a new Collateral Debt Obligation, (ii) does not otherwise satisfy clause (a) of the definition of "Collateral Debt Obligation" at the time of such origination and (iii) in the case of a Preferred Security, has a face or stated amount and a fixed maturity or redemption date. Where the context requires, the Principal Balance of each such Preferred Security shall be its face or stated amount. For the avoidance of doubt, the term 'Originated Special Loan/Preferred Security' includes other loans or other debt obligations or Preferred Securities, as applicable, received in connection with any exchange, workout, restructuring or refinancing of an Originated Special Loan/Preferred Security." This type of security did not exist in the Zohar I Indenture. Tr. at 407 (Tilton).

created upon the origination of a loan for no compensation and had both a redemption date and a coupon which would payout if the company to whom the loan was made ended up reaching certain performance benchmarks.[126]

An equity workout security is a security which the Zohar Funds would receive in exchange for either a portion or all of the amount of a collateral debt obligation that occurred as part of a workout restructuring or bankruptcy.[127] Again, these are specifically identified in the Zohar Indentures.

For a third type of equity interest, so-called "equity upside interests,"[128] Patriarch is adamant that documents related to these interests need not be produced

---

[126] Tr. 407–409 (Tilton).

[127] Tr. 399 (Tilton).

[128] Patriarch's attempt at trial to explain or describe equity upside interests was, at best, confusing and, at worst, codswallop. *See, e.g.*, Tr. 403, 483–484, 515, 519–22 (Tilton); Tr. 250 (Dudley) (Q. "Do you have an understanding of - - or have you ever heard the term 'equity upside interest?'" A. "I've heard it. Yes." Q. "Do you have an understanding as to what it is?" A. "Not 100 percent, no." Q. "Would you enter equity upside interest into the loan administration system?" A. "Can you tell me your explanation of an upside interest?" Q. "No. I'm asking if you are aware you said you've heard the term, and so I'm wondering whether it's a term you've used in connection with work you've done in the loan administration system." A. "No. I wouldn't have." Q. "So you did not enter equity upside interest into the loan administration system?" A. "Not to my knowledge, no.".

As best I can discern, equity upside interests are membership rights that the Zohar Funds enjoy as evidenced by LLC agreements or shareholder agreements. In her testimony, Tilton explained that in this arrangement she paid for and acquired the equity of portfolio companies through various LLC or shareholder agreements and then shared the upside of this equity with the Zohar Funds as reflected in the terms of the LLC agreements or shareholder agreements. Through this arrangement, she claims, the Zohar Funds are able to enjoy rights to the equity upside without carrying any of the liabilities

39

because they do not in any manner "relate to Collateral." Indeed, Patriarch contends that the Zohar Funds are forbidden by the Zohar Indentures from holding "equity upside interests" as Collateral and that a declaration from this Court that the Zohar Funds do hold such Collateral will cause a default under the Zohar Indentures.[129] Moreover, Patriarch argues that such a declaration would strip Tilton of her interests in the equity upside interests which Tilton acquired with personal funds and for which she bears the entire tax burden. The Zohar Funds counter that regardless of what the Zohar Indentures state about what can and cannot be held as Collateral, based on the broad definition of Collateral, the documents that evidence the Zohar Funds' equity upside interests are required to be produced since the funds do enjoy "rights" with respect to such interests.

As to the equity kickers and equity workout securities, because there is no dispute that such interests represent Collateral of the Zohar Funds, the documents that relate to these interests must be produced. The Zohar Funds offered evidence

---

of the equity—liabilities which the Zohar Funds are restricted from assuming under the Zohar Indentures--because these liabilities are carried by her individually.

[129] Under negative covenants contained in Article 7 of the Zohar Indentures and eligibility criteria for Collateral contained in Article 12 of the Zohar Indentures, the Zohar Funds are not permitted to acquire various types of Collateral in a variety of situations. Relevant here is the restriction against encumbering the Collateral with any type of liability, *e.g.*, tax liability, that might be associated with the acquisition of equity. *See* Zohar Indentures §7.8(a); §12.1.

40

of these documents at trial.[130] Therefore, any documents that reflect or relate to the Zohar Funds interests in equity kickers or equity workout securities which remain outstanding must be produced in accordance with the implementing order.

As to the final type of equity, equity upside interests, I decline to determine whether or not the underlying interests contained in various LLC Agreements represent Collateral of the Zohar Funds or whether such interests belong to the Zohar Funds, Patriarch Partners or Tilton. Even if I accept Patriarch's description of the equity upside interests, it is clear that the Zohar Funds may, at some point, enjoy the rights and benefits of such upside interests. Thus, even if the equity upside interests are not currently Collateral, documents reflecting such interests broadly "relate to Collateral" in the sense that they relate to rights in equity interests that the Zohar Funds may draw upon at a "particular time" in the future to satisfy their obligations to noteholders.

Evidence at trial revealed that there are documents—*e.g.*, LLC agreements, shareholder agreements, stock certificates—that reflect the equity upside interests given to the Zohar Funds.[131] Patriarch admitted as much in its post-trial brief.[132]

---

[130] Tr. 236–237 (Dudley) (Q. "[I]t's your testimony that the only type of equity [the loan administration system] tracks is an equity kicker?" A. "Yes." Q. "And what do you understand an equity kicker to be?" A. "It's equity that's attached to a loan."); Tr. 18–19, 72–73 (LaPuma); Tr. 116–17 (Whalen); Tr. 368 (Marsal); Tr. 467–77, 483–90 (Tilton).

[131] Tr. 405–406, 488, 518 (Tilton).

[132] Defs.' Post-Trial Br. at 88–89.

In fact, Patriarch produced exemplars of these documents in this litigation but insist that the Zohar Funds and AMZM enter confidentiality agreements before any additional documents will be produced.[133] As previously explained, that condition is not justified by the Patriarch CMAs. Therefore, since documents reflecting the equity upside interests relate to Collateral of the Zohar Funds, in the broadest sense, these documents must be produced in accordance with the implementing order.

### 3. New Deal Documents

New deal documents are documents that memorialize the closing of transactions in which the Zohar Funds made investments. Because these closing documents memorialize investments of the Zohar Funds, they are documents relating to Collateral. The Zohar Funds introduced evidence of these documents at trial.[134] Therefore, any documents that memorialize the closing of transactions in which the Zohar Funds made investments which remain outstanding must be produced in accordance with the implementing order.

### 4. Acquisition, Transfer and Disposition Documents

These documents include records that reflect the terms of the Zohar Funds' acquisition, transfer, or disposition of assets. As these documents reflect instances

---

[133] *Id.*

[134] Tr. 224–225 (DeVito) (Q. "There were legal documents created that memorialized the closing of that transaction, correct, sir?" A. "There were legal documents created.").

in which the Zohar Funds acquired, transferred, or disposed of assets, the documents which reflect these transactions relate to Collateral or to the performance of services under the Patriarch CMAs. The Zohar Funds introduced evidence of these documents, which include so-called "trade tickets," at trial.[135] Therefore, any documents that reflect the acquisition, transfer, or disposition of assets by the Zohar Funds, including trade tickets, must be produced in accordance with the implementing order.

### 5. Waiver and Forbearance Documents

These documents reflect instances when Patriarch, on behalf of the Zohar Funds, granted a waiver of a payment or a forbearance of interest in favor of a portfolio company. Because these documents reflect the interest that the Zohar Funds can expect to receive going forward, they are documents that relate to Collateral or relate, at least, to Patriarch's services as Collateral Manager. The Zohar Funds presented evidence of these documents at trial, including notices that

---

[135] Tr. 150–152 (Whalen); Tr. 252–254 (Dudley) (Q. Now, Patriarch maintained records of when it acquired assets for the Zohar Funds; correct?" A. "Yes." Q. "Those records include trade tickets?" A. "Yes." Q. A trade ticket is a record of the transaction; right?" A. "Yes." Q. "Trade tickets were also created when there was a disposition of a piece of collateral correct?" A. "Yes." Q. "Trade tickets were also used to record other changes, such as a change in interest rate on a loan, a change in maturity, or a new loan; right?" A. "Yeah. And so were amendments."). According to Tilton, Patriarch would create a trade ticket to summarize the terms of loans made by the Zohar Funds for use in the preparation of trustee reports and for input into the loan administration system. Tr. 402 (Tilton) ("[Y]ou've heard about these trade tickets . . . . [i]t was a form that we filled out that would have all the terms of the underlying loan obligation so that it could be put into the trustee reports and it could be put into the loan administration system.").

were signed on behalf of the Zohar Funds.[136] Any analysis undertaken by Patriarch to determine whether to grant a waiver or forbearance need not be produced as such analyses would reflect internal, proprietary work product that would not be property or documents of the Zohar Funds. The documents signed on behalf of the Zohar Funds which reflect waiver of payments or forbearance of interest, however, are documents of the Zohar Funds relating to the Collateral, or Patriarch's services as Collateral Manager, and must be produced in accordance with the implementing order.

### 6. Restructuring Documents

These documents evidence the restructuring of credit agreements. Because these documents set out the terms of the Zohar Funds' investments that have been restructured, they are documents relating to Collateral. The Zohar Funds introduced evidence regarding these documents at trial.[137] The Zohar Funds also introduced evidence of spreadsheets prepared by Patriarch employees that analyze the impact of restructurings and reviews prepared by credit analysts that evaluate

---

[136] Tr. 162–163 (Whalen); Tr. 255–257 (Dudley) (Q. "Now, the interest waiver forms that you indicated were signed by Miss Tilton, do you know whether those were included among the categories of documents that were turned over to A&M?" A. "I don't know." . . . . Q. "Well, let me ask who she was waving it on behalf of." A. "Well, if the interest was due to the Zohar Funds, it would have been for the Zohar Funds.").

[137] Tr. 166–168 (Whalen) (Q. "There are records that are maintained with respect to restructurings of credit agreements, aren't there?" A. "Yes.").

the impact of potential restructurings on the portfolio companies.[138] These documents are the type of internal work product to which the Zohar Funds have admitted they are not entitled. Therefore, any documents that reflect the restructuring of the credits agreements held by the Zohar Funds or the terms of these restructurings must be produced in accordance with the implementing order, but internal analyses prepared by Patriarch regarding the impact of potential restructurings need not be produced.

### 7. Trustee Reporting Documents

These documents include the documents used by the Trustee to prepare periodic reports. Because these documents reflect current and historical assets of the Zohar Funds, they are documents relating to Collateral or Patriarch's services as Collateral Manager. The Zohar Funds produced evidence of these underlying documents at trial.[139] The fact that these documents may also be in the possession of the Trustee does not relieve Patriarch of its obligation to produce them under the Patriarch CMAs as no such qualification appears in those agreements. Any

---

[138] Tr. 166–168 (Whalen) (Q. "For example, there's a spreadsheet prepared by the structured finance group that looks at the impact of a restructuring of certain tests under the CLO indenture, is that right?" A. "Yes.").

[139] Tr. 261–262 (Dudley) (Q. "It was also your responsibility to send issuer orders to the trustee; correct?" A. "Yes." Q. "And you also provided borrowing notices, interest rate notices, change forms, and rate-set notices to the trustee; is that right?" A. "Yes. I believe so. Yes." Q. "And all of those documents were saved in a centralized location on the Patriarch share drive; correct?" A. "Yes.").

underlying documents that belong to the Zohar Funds in Patriarch's possession that it supplied to the Trustee so that the Trustee could prepare periodic reports must be produced in accordance with the implementing order.

## 8. Third Party Reporting Documents

These documents include reports that were prepared for third parties, most notably rating agencies. The underlying documents that were used to prepare these reports are documents that reflect the assets held by the Zohar Funds and are therefore documents of the Zohar Funds relating to the Collateral or Patriarch's services as Collateral Manager. Any summaries of these documents that were given to third parties, however, need not be produced to the extent they reflect Patriarch's internal work product. The Zohar Funds presented evidence that Patriarch did possess and utilize underlying financial information belonging to the Zohar Funds in order to prepare its internal analyses.[140] Patriarch is not obligated, however, to turn over spreadsheets it prepared related to the portfolio companies that were sent to the rating agencies or presentations that Patriarch prepared for the

---

[140] Tilton Dep. 167:20–168:10 (Q. "Did you give the rating agencies any factual non-subjective information?" A. "Yes." Q. "Like what?" A. "Monthly financials, audited financials. They're usually hundreds of pages of backup information to our templates that were provided to the rating agencies. Any kind of underlying security agreements, audited financials, monthly financials, any kind of formal waivers or restructures, any kind of formal documentation as in the objective data that we're talking about would have been attached to any subjective or Patriarch analysis done."); Tr. 171 (Whalen) (Q. "[Spreadsheets] went to the rating agencies twice a year correct?" A. "Along with - - yes, along with underlying financial information that we used to do the analysis.").

rating agencies related to the Zohar Funds as these documents reflect internal work product of Patriarch.[141] Any documents that reflect the underlying financial information that was used to prepare the third party reports, however, must be produced in accordance with the implementing order.

### 9. Related Party Transactions

These documents include documents that reflect related party transactions in which the Zohar Funds were involved. Even if these transactions involved Patriarch or Tilton personally, if they also involved the Zohar Funds, and reflect the encumbrance, disposition or acquisition of Zohar Funds assets, then the documents reflecting these transactions are documents of the Zohar Funds relating to Collateral. The documents that reflect related party transactions, therefore, must be produced in accordance with the implementing order. Any internal legal or other proprietary analyses of related party transactions, however, need not be produced.

### 10. Portfolio Company Financial Documents

These documents include financial information obtained from the portfolio companies to which the Zohar Funds have extended loans. Because these documents relate to the loans made to the portfolio companies, these documents are documents of the Zohar Funds relating to Collateral. Evidence was presented

---

[141] Tr. 170–172 (Whalen).

at trial that these portfolio company financial documents were, in some instances, received by Patriarch on behalf of the Zohar Funds in its capacity as Collateral Manager.[142] Other portfolio company documents were acquired by Patriarch in the performance of roles other than Collateral Manager. Any portfolio company financial documents that were acquired by Patriarch while performing a role in which it was not acting as a representative of the Zohar Funds need not be produced since these documents do not belong to the Zohar Funds. To be clear, however, any company financial documents received by Patriarch on behalf of the Zohar Funds must be produced in accordance with the implementing order.

## 11. Tax and Accounting Documents

These documents include any tax or accounting documents that either are issued by taxing authorities to the Zohar Funds or prepared on behalf of the Zohar Funds. Patriarch has resisted producing tax documents out of concern that Tilton's personal tax information might be exposed if Patriarch is required to produce these documents.[143] According to Patriarch, because these tax documents relate to equity upside interests, interests which they argue are not and cannot be Collateral, the

---

[142] Tr. 174–177 (Whalen); Tr. 451–452 (Tilton) (Q. "Mr. Whalen, you are aware of Patriarch being entitled to receive financial documents from portfolio companies pursuant to the terms of credit agreements, correct?" A. "Yes." . . . . Q. "Now is it your best belief that the credit analysts saved the portfolio company financials that were received to the P drive?" A. "Yes.").

[143] Defs.' Post-Trial Br. at A-4 ("[T]he tax documents Plaintiffs seek are Ms. Tilton's personal documents, and the financial information reflected on those documents flow directly into Ms. Tilton's personal tax returns.").

information flows directly through to Tilton's personal tax returns.[144] In addition to contending that the equity upside interests are related to Collateral, the Zohar Funds argue in any case that the tax documents at issue, such as K-1s, are issued in the name of the Zohar Funds and therefore must be produced.[145] Because the tax documents reflect assets held by the Zohar Funds, and reflect the tax obligations of the Zohar Funds with respect to these assets, these documents are documents of the Zohar Funds relating to Collateral. Evidence was presented that tax documents, such as Schedule K-1s, issued on behalf of the Zohar Funds were received care of Patriarch.[146] To the extent that any purely personal tax information of Tilton's is revealed in the Zohar Funds tax documents, such information can be redacted. Any tax or accounting documents which were issued in the name of the Zohar Funds or on behalf of the Zohar Funds must be produced in accordance with the implementing order.

---

[144] *Id.*

[145] Post-Trial Arg. at 50 ("There are K-1s issued in our name. It is our responsibility in the eyes of the I.R.S. So we need to know the full picture, the full situation. We could get a call from the I.R.S. tomorrow asking what's going on with company X. We have no idea. We don't have the documents. So we need them.").

[146] Tr. 553 (Tilton) (Q. "This K-1 indicates that it was actually issued by Galey & Lord to Zohar I. Do you see that?" A. "Yes." Q. "Care of Patriarch Partners, correct?" A. "Yes."); JTX-36.

## 12. Other Zohar Fund Execution Documents

These documents include any documents that were executed on behalf of the Zohar Funds to the extent they are not captured by the categories previously discussed. These documents reflect instances where Patriarch signed agreements on behalf of the Zohar Funds and thereby bound the Zohar Funds to those agreements. The Zohar Funds introduced evidence that when documents, such as contracts, were entered into on behalf of the Zohar Funds, these documents were maintained by Patriarch as Collateral Manager.[147] These documents evidence instances when the Collateral Manager took potentially binding positions on behalf of the Zohar Funds. Any documents that were executed by Patriarch on behalf of the Zohar Funds or signed in the name of the Zohar Funds that relate to Collateral or while performing as Collateral Manager must be produced in accordance with the implementing order.

## III. CONCLUSION

Patriarch is obligated under the Patriarch CMAs to produce all property and documents of the Zohar Funds relating to Collateral and to make books of account and records relating to Collateral accessible for inspection. Having reviewed the evidence presented at trial, I have determined that there are documents identified by the Zohar Funds which Patriarch is obliged to produce upon the termination of

---

[147] Tr. 122–123 (Whalen).

its services as Collateral Manager but has not yet produced. These documents must be transmitted to the Zohar Funds and their new Collateral Manager, AMZM, consistent with Patriarch's contractual obligations. The collection and production of these documents will no doubt place a burden, perhaps even a significant one, on Patriarch. But Patriarch has enjoyed the substantial benefits of the Patriarch CMAs for many years and has known all along that it would face substantial document production obligations when and if its service as Collateral Manager to the Zohar Funds came to an end. It is now time to fulfill those obligations.

The Zohar Funds shall submit an implementing order on notice within five (5) days. In addition to reflecting the rulings in this opinion, the implementing order shall include the following elements: (1) a provision for the rolling production of documents hereby ordered to be commenced within five (5) business days of the entry of the order and completed within twenty (20) days; (2) the means and format of production; (3) a process by which a Special Master will be appointed to facilitate compliance with the implementing order, said appointment to be made within ten (10) days; and (4) any other proposed conditions that will facilitate compliance with the letter and spirit of this post-trial decision.

**IT IS SO ORDERED.**