OPINION OF THE COURT
Ajbdus-Salaam, J.
In this breach of contract action, we have been asked to interpret the terms of a royalty provision contained in a 1961 *242 United States copyright renewal agreement between the legendary Edward Kennedy “Duke” Ellington (Duke Ellington) and Mills Music, Inc. (now EMI). We hold that the disputed terms of the Agreement are clear and unambiguous. Thus, we affirm the Appellate Division.
I
Plaintiff Paul Ellington, an heir and grandson of Duke Ellington, commenced this breach of contract action to recover royalties allegedly due under a royalty provision contained in a copyright renewal agreement dated December 19, 1961. The Agreement designates Duke Ellington and named members of his family as the “First Parties.” The Agreement is expressly binding upon all of Duke Ellington’s heirs and assigns. The Agreement defines “Second Party” as consisting of a group of music publishers including Mills Music, Inc. (whose successor in interest is respondent EMI) as well as “AMERICAN ACADEMY OF MUSIC, INC., GOTHAM MUSIC SERVICE, INC., and their predecessors in interest, and any other affiliate of Mills Music, Inc.” (Agreement, preamble).
The Agreement assigned to the Second Party the right to renew the United States copyright to certain musical compositions written by Duke Ellington, specified in Schedules 1, 2, and 3 of the Agreement, subject to the payment of royalties. Accordingly, the music publishers designated as the Second Party owned the copyright to the relevant compositions and were required to renew the copyrights on behalf of Duke Ellington. Specifically, the Agreement states that Duke Ellington confirms that “Mills Music, Inc., American Academy of Music, Inc., and Gotham Music Service, Inc., or any of their predecessors in interest or any other affiliated companies of Mills Music, Inc., not specifically mentioned, were and are now possessed of and are entitled to the original copyrights of the [relevant] musical compositions” (Agreement ¶ 5).
Paragraph 3 (a) of the Agreement, the royalty provision at issue, requires the Second Party to pay the First Parties “a sum equal to fifty (50%) percent of the net revenue actually received by the Second Party from . . . foreign publication” of the relevant musical compositions (Agreement ¶ 3 [a] [emphasis added]). This type of provision is known as a “net receipts” arrangement under which a composer, such as Duke Ellington, would collect royalties based on income received by a publisher after the deduction of fees charged by foreign subpublishers (see *243 e.g. Jobim v Songs of Universal, Inc., 732 F Supp 2d 407, 413 [SD NY 2010]). At the time the Agreement was executed, foreign subpublishers were typically unaffiliated with domestic music publishers. Recently, however, many domestic publishers, including EMI, have affiliated with foreign subpublishers and it is this development that forms the basis of plaintiffs claim of breach of contract.
Pursuant to limited audit rights allowed by contract, plaintiff requested an audit of EMI. During the audit plaintiff discovered that EMI had begun using affiliated foreign subpublishers, who retained 50% of the royalties generated from the foreign sale of the relevant musical compositions originally retained by the unaffiliated subpublishers. The remaining 50% was split equally between EMI and the First Parties as required by the royalty provision.
Plaintiff commenced this action against EMI alleging breach of contract and fraudulent concealment, and also requested declaratory and injunctive relief.[1] Plaintiff claimed that by using affiliated foreign subpublishers, EMI was double-dipping into the entire pot of revenue generated from the foreign sale of the relevant musical compositions. Essentially, plaintiff claims that the amount retained by the affiliated foreign subpublishers prior to remittal of the remainder to EMI is an amount received by EMI, and therefore, when using affiliated foreign subpublishers, EMI should remit to the First Parties half of the entire amount generated from the foreign sale of the relevant musical compositions. By failing to do so, he alleges that EMI has breached the Agreement by diluting his share of the royalties.
EMI moved to dismiss plaintiffs complaint pursuant to CPLR 3211 (a) (1) and (7), arguing that its method of accounting and payment is consistent with the terms and conditions of the Agreement. In opposition, plaintiff argued that the terms of the Agreement are ambiguous and he therefore needed discovery.
Supreme Court granted EMI’s motion, and dismissed the amended complaint in its entirety (Ellington v EMI Music, Inc., 33 Misc 3d 1209[A], 2011 NY Slip Op 51827[U] [Sup Ct, NY County 2011]). The court held that “[t]he royalty payment provision is clear and unambiguous” (id. at *4). “[T]he contracting parties made no distinction in the royalty payment terms based on whether the foreign subpublishers are affiliated or unaffiliated with the [domestic] publisher” and thus, the court *244 determined “it would be improper at any time, but especially now, some 50 years after the date of the [Agreement]’s execution, to read such a distinction into the [Agreement]” (id.). The court also held that “[a]bsent explicit language demonstrating the parties’ intent to bind future affiliates of the contracting parties, the term ‘affiliates’ [in the definition of Second Party] includes only those affiliates in existence at the time that the contract was executed” (id. at *5).
The Appellate Division affirmed (Ellington v EMI Music Inc., 106 AD3d 401 [1st Dept 2013]), holding that Supreme Court “correctly determined that the [Agreement's definition of ‘Second Party’ included only the parties named therein and ‘other affiliates of [EMI]’ that were in existence at the time the [A]greement was executed,” which “did not include foreign sub-publishers that had no existence or affiliation with [EMI] at the time of contract” (id. at 403). This Court granted plaintiff leave to appeal (21 NY3d 865 [2013]).
II
Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole (see Greenfield v Philles Records, 98 NY2d 562, 569 [2002]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162-163 [1990]). “The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning” (Brooke Group v JCH Syndicate 488, 87 NY2d 530, 534 [1996]; see Quadrant Structured Prods. Co., Ltd. v Vertin, 23 NY3d 549, 564 [2014]; J. D'Addario & Co., Inc. v Embassy Indus., Inc., 20 NY3d 113, 119 [2012]).
An agreement is unambiguous “if the language it uses has ‘a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion’ ” (Greenfield, 98 NY2d at 569, quoting Breed v Insurance Co. of N. Am., 46 NY2d 351, 355 [1978]). Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties’ intent (see Brooke Group v JCH Syndicate 488, 87 NY2d 530, 534 [1996]), or when specific language is “susceptible of two reasonable interpretations” (State of New York v Home Indem. Co., 66 NY2d 669, 671 [1985]; see Chimart Assoc. v Paul, 66 NY2d 570, 573 [1986]). “The best evidence of *245 what parties to a written agreement intend is what they say in their writing ... a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms” (Greenfield, 98 NY2d at 569 [citation and internal quotation marks omitted]).
Plaintiff argues that two terms in the Agreement are ambiguous: (1) the phrase “net revenue actually received” in the royalty provision and (2) the term “any other affiliate” in the definition of Second Party.
A. “Net Revenue Actually Received”
As stated, the royalty provision provides that the “Second Party” will pay to the “First Parties” “a sum equal to fifty (50%) percent of the net revenue actually received by the Second Party from . . . foreign publication” (Agreement ¶ 3 [a] [emphasis added]). This language is not ambiguous, as a plain reading of the provision indicates that plaintiff, through payment to the First Parties, is entitled to receive 50% of the net revenue actually received from foreign subpublishers.
The Agreement does not state what percentage of the net receipts generated from the foreign sale of the relevant musical compositions is to be retained by the foreign subpublishers. Rather, it states only that whatever amount EMI actually received would be split equally with the First Parties. The Agreement contemplates that the royalties paid to the First Parties would be based on the revenue remitted to EMI itself. Although at the time the Agreement was executed the parties apparently did not contemplate that EMI would affiliate itself with foreign subpublishers, the percentage retained by the affiliated foreign subpublishers is not an amount actually received by EMI, but a fee for the subpublishers’ services.
The royalty provision makes no distinction between affiliated and unaffiliated foreign sub publishers. Therefore, the courts below properly declined to read such a distinction into the contract as it does not appear to have been the intent of the parties that such a distinction be included, primarily because they were understandably unaware that such a change in the industry would occur. Nonetheless, the Agreement does not prevent EMI from using affiliated foreign subpublishers, and it does not prevent the affiliated foreign subpublishers from retaining a portion of the total sale owed to them for their ser *246 vices, prior to remitting the remainder to EMI.[2] Thus, the phrase “net revenue actually received” is not ambiguous.
B. “Any Other Affiliate”
The second phrase plaintiff claims is ambiguous is within the definition of Second Party. The Agreement defines “Second Party” as consisting of a group of music publishers including “MILLS MUSIC, INC., a New York corporation, AMERICAN ACADEMY OF MUSIC, INC., GOTHAM MUSIC SERVICE, INC., and their predecessors in interest, and any other affiliate” (Agreement, preamble). Plaintiff asserts that the affiliated foreign subpublishers are included in the term “any other affiliate.”
Absent explicit language demonstrating the parties’ intent to bind future affiliates of the contracting parties, the term “affiliate” includes only those affiliates in existence at the time that the contract was executed (VKK Corp. v National Football League, 244 F3d 114, 130-131 [2d Cir 2001] [“The Release’s reference to ‘affiliates’ (is) stated in the present tense. Nothing . . . indicates the inclusion of future rather than present members”]; Budget Rent A Car Sys., Inc. v K&T, Inc., 2008 WL 4416453, *4, 2008 US Dist LEXIS 73024, *10-11 [D NJ, Sept. 24, 2008, No. 2:05-CV-3655 (WJM)(RJH)] [the exclusive license at issue was not violated here because “(n)othing in the License Agreement suggests that the parties intended the License Agreement to extend to future corporate parents or affiliates”]).
Furthermore, the parties did not include any forward looking language. If the parties intended to bind future affiliates they would have included language expressing that intent. Absent such language, the named entities and other affiliated companies of EMI’s predecessor which existed at the time are bound by the provision, not entities that affiliated with EMI after execution of the Agreement. As it is undisputed that the affiliated foreign subpublishers at issue here were not affiliates at the time the Agreement was executed, they are not members of the Second Party.
*247 Additionally, the use of present tense language in the Agreement also demonstrates that the parties intended that the Agreement would bind only affiliates in existence at the time of the Agreement. A later clause in the Agreement states that Duke Ellington confirms that “Mills Music, Inc., American Academy of Music, Inc., and Gotham Music Service, Inc., or any of their predecessors in interest or any other affiliated companies of [EMI] not specifically mentioned, were and are now possessed of and are entitled to the original copyrights of the [relevant] musical compositions” (Agreement ¶ 5 [emphasis added]). This language indicates that the parties intended that the members of the Second Party were to be entities who own the copyright in the relevant musical compositions, rather than entities, who for any number of reasons, may be affiliated with the publisher. As the affiliated foreign subpublishers do not acquire a United States copyright to the relevant compositions, the parties likely would not have intended them to be members of the Second Party. The role of the affiliated foreign subpublishers is simply to provide subpublication services in their respective countries. EMI still retains the copyright to the relevant musical compositions.
m
We conclude that the terms “net revenue actually received” in paragraph 3 (a) and “any other affiliate” in the definition of Second Party are not ambiguous.
We note that the globalization of the music industry has rendered this “net receipts” arrangement much more favorable to music publishers than to artists.[3] Nonetheless, we must examine the parties’ intentions based on the plain language within the four corners of the Agreement. In 1961, Ellington and Mills Music, Inc. agreed that they would share equally the royalties that Mills Music, Inc. actually received from the foreign sale of the relevant musical compositions. EMI’s corporate reconfiguration did not, as the dissent suggests, “avoid the understanding of the parties” (dissenting op at 253). Rather, the parties merely did not account for the possibility that the publisher would *248 eventually affiliate with foreign subpublishers. The terms of the contract are clear and unambiguous and the Appellate Division correctly held that plaintiff has not stated a cause of action for breach of the agreement.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Plaintiff abandoned his fraudulent concealment claim.

. Plaintiffs argument that defendant may have breached the covenant of good faith and fair dealing by paying its affiliated foreign subpublishers rates that far exceed the market rate paid to unaffiliated subpublishers was raised for the first time in this Court, and is unpreserved. Although the parties mentioned in their Appellate Division briefs a hypothetical case where EMI may have breached the covenant of good faith and fair dealing, plaintiff did not plead that claim and did not squarely make that claim prior to his appeal to this Court.

. According to the parties, rather than the “net receipts” type of arrangement at issue in this case, agreements between artists and music publishers now usually employ an “at source” formula, under which an artist “collects] royalties based on a percentage of income determined before licensing fees are deducted” (Jobim v Songs of Universal, Inc., 732 F Supp 2d 407, 413 [SD NY 20101).