■ CONCORD ASSOCIATES, L.P., et al., Appellants, v EPT CONCORD, LLC, et al., Respondents. [15 NYS3d 270]—

Rose, J. Appeal from an order of the Supreme Court (LaBuda, J.), entered July 7, 2014 in Sullivan County, which, among other things, granted defendants' motion for partial summary judgment.

Plaintiff Concord Associates, L.P. purchased approximately 1,600 acres of real property located in Sullivan County in 1999, and plaintiffs began an effort to develop a resort and casino project there. In 2007, they sought an infusion of capital from entities associated with defendants and ultimately borrowed over $162 million from defendant EPT Concord, LLC. The loan was secured by most of plaintiffs' real property and, when plaintiffs defaulted, the parties entered into a settlement agreement that included a transfer of title to the real property securing the loan to defendant EPT Concord II, LLC (hereinafter EPT).

As part of the settlement, the parties also entered into a casino development agreement (hereinafter CDA), which permitted plaintiffs to continue with their efforts to build the casino component of their original project on a small adjacent parcel that they had retained, but required them to obtain financing for their project "in substantially the form" of a master credit agreement (hereinafter MCA) annexed to the CDA. Successfully doing so within a certain time frame would trigger provisions of the CDA granting plaintiffs various rights and interests in portions of the real property that they had transferred to EPT. For its part, EPT executed a restrictive covenant, pursuant to which it agreed not to build a competing casino as part of its development of adjacent resort facilities on the transferred real property. However, the restrictive covenant provided that it would expire on December 31, 2011, un-

less plaintiffs first obtained financing "in substantially the form" of the MCA. The terms of the MCA required plaintiffs to finance their casino project primarily by means of a traditional construction loan of up to $275 million personally guaranteed by their principal, Louis R. Cappelli, and established, among other things, requirements for equity investment, maximum debt load and interest payments.

When plaintiffs were unable to secure the construction loan required by the MCA, they then put forward an alternative financing proposal, the centerpiece of which was a $395 million high-yield bond issue. In June 2011, after it appeared to plaintiffs that EPT would reject their proposal, they commenced this action seeking declarations that their proposed bond financing comported with the terms of the MCA and, therefore, the restrictive covenant should not expire. Defendants joined issue and counterclaimed for declarations that, among other things, plaintiffs had failed to offer financing for the project in substantially the form of the MCA and, therefore, the restrictive covenant should expire by its own terms. Plaintiffs moved to dismiss these two counterclaims, and defendants moved in turn for partial summary judgment on those counterclaims. Meanwhile, EPT advanced a proposal to build a casino on its adjacent property, thereby placing it in direct competition with plaintiffs. At oral argument on the motions, plaintiffs also moved for the recusal of Acting Supreme Court Justice Frank LaBuda, which motion the court denied.[1] At defendants' request, Supreme Court then converted plaintiffs' motion to dismiss to one for summary judgment, denied it and granted defendants' motion in all respects. Plaintiffs now appeal.

Initially, plaintiffs argue that Acting Justice LaBuda abused his discretion in denying their motion for recusal. We agree. "[W]hile we discern no statutory basis for [the court's] disqualification in this matter, the Rules Governing Judicial Conduct do compel a judge to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary, to refrain from allowing family, social, political or other relationships to influence his or her judicial conduct or judgment and to avoid even the appearance of impropriety. Further, while the decision of whether to recuse oneself from a particular matter lies within the discretion of the deciding

---

1. We dismissed the ensuing CPLR article 78 petition against Acting Justice LaBuda, finding that a review of the recusal issue may only be sought upon a direct appeal (*Matter of Concord Assoc., L.P. v LaBuda*, 121 AD3d 1270, 1271-1272 [2014]).

judge, that discretion is not unlimited" (*Matter of Concord Assoc., L.P. v LaBuda*, 121 AD3d 1270, 1272 n 3 [2014] [internal quotation marks, brackets and citations omitted]). Indeed, disqualification is warranted "when alleged bias and prejudice arise from an extrajudicial source and result in an opinion on the merits based on the outside source" (*People v Wilkins*, 147 AD2d 729, 730 [1989], *lv denied* 73 NY2d 1023 [1989]; *see People v Moreno*, 70 NY2d 403, 405 [1987]).

In our view, the appearance of bias and prejudice from an extrajudicial source looms over Acting Justice LaBuda's disposition of the case due to the earlier public comments of his wife, Kathleen LaBuda. In the months before Acting Justice LaBuda denied plaintiffs' recusal request and issued his order awarding summary judgment to EPT, Kathleen LaBuda, in her official capacity as the majority leader of the Sullivan County Legislature, vice chair of its Committee on Community and Economic Development and a member of the County Casino Impact Committee, had publicly voiced her support in favor of EPT's competing casino proposal, and those statements of support were reported by local and regional news outlets. In denying plaintiffs' request, however, Acting Justice LaBuda stated that he was unaware of his wife's public support for the EPT proposal and, in any event, it would "in no way impact[ ] upon [his] impartiality and fairness." These reassurances were belied by the language of the order awarding summary judgment to defendants, in which the court stated that a decision in favor of plaintiffs would be "against public policy." According to Acting Justice LaBuda, by "d[oing] nothing to develop the property from the time of acquisition, "plaintiffs were acting contrary to "[t]he legislative intent behind the development of casino gambling in New York," namely, "to revitalize economically depressed regions of the state, specifically including the Catskills."

Considering the irrelevancy of these comments to the issues before the court and the parallels between them and the public comments of Kathleen LaBuda in support of EPT's casino proposal, Acting Justice LaBuda's inclusion of such inherently legislative and policy considerations as a basis for his order displays a striking lack of "sensitivity to the aroma of favoritism [that] such a favorable disposition could engender" (*Matter of George [State Commn. on Jud. Conduct]*, 22 NY3d 323, 330 [2013]). Under the circumstances, it seems to us that Acting Justice LaBuda should have recognized that this was a situation in which his "impartiality might reasonably be questioned" (22 NYCRR 100.3 [E] [1]), and, therefore, we must conclude

that his failure to recuse himself constituted a clear abuse of discretion (*see Matter of Johnson v Hornblass*, 93 AD2d 732, 732-733 [1983]; *People v Zappacosta*, 77 AD2d 928, 929-930 [1980]; *compare People v Glynn*, 21 NY3d 614, 618-619 [2013]).

Nevertheless, we will consider plaintiffs' remaining arguments pursuant to our obligation "to review the record to determine if any issues of fact exist[ ]" (*Merritt Hill Vineyards v Windy Hgts. Vineyard*, 61 NY2d 106, 110 [1984]; *accord Morehouse v Lagas*, 274 AD2d 791, 794 [2000]). Initially, we find that conversion of plaintiffs' motion to dismiss to a motion for summary judgment is proper because the issues raised in plaintiffs' motion to dismiss were confined to issues of law that have been extensively briefed and argued by the parties (*see Spilka v Town of Inlet*, 8 AD3d 812, 813 [2004]; *Historic Albany Found. v Breslin*, 282 AD2d 981, 983-984 [2001], *lv dismissed* 97 NY2d 636 [2001]). Further, we reject plaintiffs' assertion that a motion for summary judgment is premature. The record contains all of the necessary documents to determine the adequacy of plaintiffs' financing proposal, and their claims that conducting additional discovery could yield material and relevant evidence regarding EPT's purportedly unlawful motives for rejecting the bond financing are, at best, speculative (*see Jacobs v Mazzei*, 112 AD3d 1115, 1118 [2013], *lv dismissed* 22 NY3d 1172 [2014]).

Turning to the merits, plaintiffs' central argument is that their alternative financing package "provided substantially the same benefits" as the MCA and, thus, issues of fact exist regarding whether their high-yield bond proposal satisfied the CDA's financing requirement. In our view, however, the issue is whether plaintiffs' financing proposal is "in substantially the form" of the MCA, which is expressly required by both the CDA and the restrictive covenant. Defendants' entitlement to summary judgment, then, is a question of pure contract interpretation, and it is well established that "[t]he best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [internal quotation marks and citation omitted]; *see Ellington v EMI Music, Inc.*, 24 NY3d 239, 245 [2014]).[2] This is especially true " 'in the context of real property transactions, where commercial certainty is a paramount

---

**2.** Although plaintiffs contend that we should apply Missouri law pursuant to a choice of law clause in the CDA, they have not "pointed to any actual conflict between the laws of New York and [Missouri] with regard to the is

concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length' " (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004], quoting *Matter of Wallace v 600 Partners Co.*, 86 NY2d 543, 548 [1995]).

Here, the CDA specifically provides that plaintiffs' construction financing must involve "the execution of that certain [MCA] . . . in substantially the form attached hereto as Exhibit E." This statement is wholly unambiguous, especially in light of the fact that the MCA was annexed to the CDA and its form could be readily referenced by all parties. Furthermore, as evidenced by its consistent application in other contractual settings (*see e.g. Nassau County v Metropolitan Transp. Auth.*, 99 AD3d 617, 618 [2012], *lv dismissed and denied* 21 NY3d 921 [2013]; *627 Acquisition Co., LLC v 627 Greenwich, LLC*, 85 AD3d 645, 646 [2011]; *cf. Brumer v Brumer*, 223 App Div 186, 190 [1928]), the function of the term "in substantially the form" is to require contracting parties to meet certain obligations or exercise certain rights under the contract pursuant to the material terms and structure of a separate, preexisting template. Thus, by including the requirement in the CDA and restrictive covenant that plaintiffs' construction financing be in substantially the form of the MCA, the parties clearly intended to ensure that plaintiffs comply with the MCA's material terms and not simply its overall objectives. This, plaintiffs failed to do.

While plaintiffs' alternative proposal did include, among other things, a personally guaranteed construction loan of $75 million, there is no question that this was not to be their primary source of financing. Instead, they sought to substitute as their primary source of financing a $395 million high-yield private bond issue with no personal guaranty. This proposal essentially reversed the arrangement contemplated by the MCA, which featured as its centerpiece a traditional construction loan of up to $275 million personally guaranteed by Cappelli. While the MCA also allowed for other forms of financing, they were to be in considerably smaller amounts and any bonds were to be government sponsored. Plaintiffs' proposal materially deviated from the terms of the MCA in several other respects, including the proposal's requirement that interest be paid on the total proceeds of the primary source of financing from the outset and its provision for a greater debt load and a smaller equity investment by plaintiffs in the project.

---

sues raised here[.] [Accordingly], we need not engage in a choice of law analysis" (*Wellsburg Truck & Auto Sales, Inc. v Peoples State Bank of Wyalusing*, 80 AD3d 942, 943 [2011]).

We also disagree with plaintiffs' contention that EPT waived its right to enforce the CDA's financing requirement. While EPT was aware of plaintiffs' alternative financing proposal as early as March 2011, "[p]laintiff[s] offer[ ] no evidence from which a clear manifestation of intent by [EPT] to relinquish the [right to enforce the CDA] could be reasonably inferred" (*Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d 966, 968 [1988]; *see Richard A. Hutchens CC, L.L.C. v State of New York*, 59 AD3d 766, 770-771 [2009], *lv denied* 12 NY3d 712 [2009]). Nor is EPT estopped from enforcing the CDA. Plaintiffs commenced this action in June 2011, well before the contractual deadlines to obtain financing in substantially the form of the MCA had expired and, thus, they cannot argue that they relied on EPT's words or conduct, or that EPT somehow precipitated their failure to comply with the terms of the CDA and restrictive covenant (*see Tosapratt, LLC v Sunset Props., Inc.*, 86 AD3d 768, 770 [2011]; *cf. Gilbert Frank Corp. v Federal Ins. Co.*, 70 NY2d at 968).

In light of the foregoing, we find that the evidence amply supports defendants' entitlement to summary judgment on their counterclaim for a declaration that plaintiffs' bond financing proposal is not in substantially the form of the MCA, and that plaintiffs have failed to raise a triable issue of fact in that regard (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]; *Satra Realty, LLC v Knovel Corp.*, 93 AD3d 1128, 1129-1130 [2012], *lv denied* 19 NY3d 814 [2012]). We further find it proper to award summary judgment to defendants on their counterclaim for a declaration that the restrictive covenant expired by its own terms. The execution of the MCA was a condition precedent to the extension of the restrictive covenant and, thus, plaintiffs' failure to perform this condition by December 31, 2011 allowed the covenant to expire (*see Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 690-692 [1995]; *Merritt Hill Vineyards v Windy Hgts. Vineyard*, 61 NY2d at 112-113). To the extent that plaintiffs' remaining claims have not been rendered academic by our decision, they have been examined and found to be without merit.

Garry, J.P., Devine and Clark, JJ., concur. Ordered that the order is modified, on the law, without costs, by reversing so much thereof as denied plaintiffs' motion for recusal; said motion granted; and, as so modified, affirmed.