M&C N.Y. (Times Sq.), LLC v Accor Mgt. US Inc. (2022 NY Slip Op 06888)

M&C N.Y. (Times Sq.), LLC v Accor Mgt. US Inc.

2022 NY Slip Op 06888

Decided on December 06, 2022

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: December 06, 2022

Before: Acosta, P.J., Renwick, Webber, Singh, Moulton, JJ. 

Index No. 657527/19 Appeal No. 16481 Case No. 2021-01230 

[*1]M&C New York (Times Square), LLC, Plaintiff-Appellant,
v
Accor Management US Inc., Defendant-Respondent.

Brewer, Attorneys & Counselors, New York (Cecelia L. Fanelli of counsel), for appellant.
Proskauer Rose LLP, New York (Peter J.W. Sherwin of counsel), for respondent.

Appeal from order, Supreme Court, New York County (O. Peter Sherwood, J.), entered March 1, 2021, which granted defendant's motion to dismiss the complaint pursuant to CPLR 3211(a)(1), deemed appeal from the judgment, same court and Justice, entered March 10, 2021, dismissing the complaint, and, as so considered, unanimously reversed, on the law, without costs, the judgment vacated, and the motion denied.
Factual Background
Plaintiff M&C New York (Times Square), LLC, the owner of a Novotel hotel on West 52nd Street in Manhattan (Owner), commenced this action against defendant hotel operator Accor Management US Inc. (Manager) for breach of a long-term Hotel Management Agreement (HMA) after audits identified purported accounting, reporting, and other deficiencies.[FN1]
Prior to bringing this action, Owner served a notice of default dated April 29, 2019, on Manager asserting, inter alia, negligent accounting practices, misuse of hotel funds, unsupported payments and expenses, overcharge of fees, failure to remediate onsite conditions, and failure to utilize commercially reasonable efforts to maximize profits. The notice also demanded that Manager cure the defaults by June 3, 2019, and make payment of $3.2 million for damages "reasonably determined to date." The notice also demanded that Manager, among other things, issue accurate accounting and financial records, implement accounting controls, and train staff.
By letter dated May 30, 2019, Manager disputed the alleged defaults, but asserted that it had cured the defaults or would cure them by June 3, 2019. It paid $3.2 million to Owner "under protest" and requested that Owner provide "the specific basis for each and every part of that amount."
By letter dated August 19, 2019, Owner itemized the $3.2 million demand. Owner further asserted that Manager failed to sufficiently explain or substantiate how it had cured the defaults and remained in default. The letter requested that Manager "respond, on or before August 30, 2019, providing all additional information and clarification demanded above" and warned that, "[a]bsent a satisfactory response, Owner may take further steps to protect its rights without further notice . . . without prejudice to all of Owner's rights and remedies under the Management Agreement and at law, all of which are expressly reserved."
On August 30, 2019, approximately four months before Owner commenced this action, Manager commenced an action against Owner for a declaration that it did not breach the HMA, for the return of its $3.2 million payment based on Owner's breach of the HMA, and for injunctive relief barring Owner from terminating the HMA. Manager subsequently amended its complaint to, among other things, abandon its request for injunctive relief conceding that it "has no ability to force [Owner] to continue to allow it to operate the Hotel pursuant to the HMA."[FN2] Manager's action is still pending.
By notice of termination dated December 17, 2019, Owner terminated the [*2]HMA and commenced the instant action the same day.
Procedural Background
In January 2020, Manager moved to dismiss Owner's complaint pursuant to CPLR 3211(a)(1) and (7), asserting that Owner forfeited any remedies under the HMA by terminating it in violation of sections 14.3 and 15.13 of the HMA.
Section 14.3 provides:
"Notwithstanding the foregoing or anything to the contrary contained in this Agreement, neither Owner nor Manager shall be deemed to be in default under this Agreement with respect to any of the Events of Default . . . or have the right to terminate this Agreement in respect of such Event of Default, if (A) a bona-fide dispute with respect to such Event of Default has arisen between Owner and Manager and (B) either (x) less than fifteen (15) days (or such later period as agreed to in writing by Owner and Manager) has elapsed following the expiration of the cure period applicable to such Event of Default or (y) such dispute has been submitted to the appropriate court of competent jurisdiction . . . prior to the expiration of the fifteen (15) day (or later) period in (x) above. Upon initiation of legal proceedings, the non-defaulting party shall only have the right to terminate this Agreement if the court has made a final, non-appealable determination that the alleged act or omission did constitute an Event of Default under this Agreement."
Section 15.13 provides, in relevant part:
"Owner and Manager each acknowledge that they are entering into this Agreement in reliance on the long-term nature of this Agreement, and further acknowledge that the rights, duties, powers and authority of each of the parties hereto, are intended to be non-terminable throughout the Term, except in accordance with the express provisions of this Agreement or, as a remedy for the occurrence of any default . . . [and] irrevocably waive and relinquish any right, power or authority existing at law or in equity, including, without limitation, any such right, power or authority referred to in Robert E. Woolley v. Embassy Suites, Inc., 227 Cal. App. 3d 1520 (1990), Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc. et al., 19 Cal. App. 4th 615 (1993) and their progeny, to terminate this Agreement or Manager's authority hereunder, except in accordance with the express provisions of this Agreement."
Supreme Court granted the motion on the basis that documentary evidence established that Owner terminated the HMA in violation of section 14.3 and consequently, that Owner's repudiation precluded it from obtaining any remedies.
The court concluded that Owner violated section 14.3 because Manager timely commenced an action disputing the defaults, thereby entitling it to a safe harbor.[FN3] The court found Manager's August 30, 2019 action timely because Owner's August 19, 2019 letter granted Manager "an additional 11 days to provide information about how the defaults identified in the Notice of Default were cured, effectively extending defendant's time to cure." [*3]Because Manager filed suit within these 11 days, the court concluded that Owner violated section 14.3 by terminating the HMA before the resolution of Manager's action.
In finding that Manager was entitled to a safe harbor, the court rejected Owner's argument that its April 29, 2019 notice of default triggered a 30-day cure period and a 15-day grace period under section 14.3, which expired on June 13, 2019, thereby rendering Manager's action untimely.[FN4] The court also rejected Owner's contention that sections 14.3 and 15.13 were unenforceable, reasoning that while a "principal always possesses the power to revoke defendant as an agent," Owner "did not have the power under the HMA to do so without consequences." Owner appealed.
Discussion
As an initial matter, we deem Owner's notice of appeal from the order a valid notice of appeal from the judgment entered on the order (see CPLR 5520[c]; Robertson v Greenstein, 308 AD2d 381, 382 [1st Dept 2003], lv dismissed 2 NY3d 759 [2004]). Supreme Court correctly rejected Owner's argument that sections 14.3 and 15.13 of the HMA are unenforceable. Generally, "a principal has the power to revoke at any time his agent's authority to represent him" (Wilson Sullivan Co. v International Paper Makers Realty Corp., 307 NY 20, 24 [1954]; see G.K. Alan Assoc., Inc. v Lazzari, 44 AD3d 95, 102 [2d Dept 2007], affd 10 NY3d 941 [2008]). However, the corollary to that rule is that if, in exercising its power to revoke the agency, the principal has violated its contractual obligations, "it must respond to [the agent] in damages" (Wilson Sullivan, 307 NY at 24-25).
Notably, in section 15.13, Owner waived its right, power, or authority to terminate the HMA except in accordance with its terms, "including, without limitation, any such right, power or authority referred to in Robert E. Woolley v. Embassy Suites, Inc., 227 Cal. App. 3d 1520 (1990), Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc. et al., 19 Cal. App. 4th 615 (1993) and their progeny." This demonstrates not only an unambiguous agreement not to terminate the HMA in a manner that would violate its express terms, but also a clear acknowledgment by the parties of the rule articulated in Woolley and Pacific Landmark, i.e., that while a hotel operator will not be entitled to injunctive relief against the owner for revoking its agency agreement, consistent with New York law (see Wilson Sullivan, 307 NY at 24-25), the owner may be cast in damages if the revocation was in violation of the agreement. Moreover, contrary to Owner's contention, section 14.3 is not a "de facto injunction" merely because Owner might ultimately be found responsible for damages for wrongful termination.
However, Supreme Court erred in dismissing Owner's action on the basis that Owner terminated the HMA in violation of section 14.3 and, consequently, that Owner was precluded from obtaining any remedies. The court's ruling hinged on its unfounded conclusion that Owner's August 19, 2019 letter[*4]"effectively extend[ed] defendant's time to cure." The letter cannot be reasonably construed as an extension of Manager's time to cure. Nothing in the letter refers to Owner's extension of any cure period. Owner sent the letter to reinforce its position that Manager's earlier letter did not "demonstrate that Manager has cured the defaults identified in the Notice of Default" and "substantiates Manager's ongoing material breaches of the Management Agreement." Owner's warning that, "[a]bsent a satisfactory response, Owner may take further steps to protect its rights without further notice . . . without prejudice to all of Owner's rights and remedies under the Management Agreement" further undermines the court's conclusion.
Accordingly, because Manager did not timely bring its action, it was not entitled to a safe harbor under section 14.3. As Owner asserted, service of Owner's April 29, 2019 notice of default triggered a 30-day cure period and an additional 15-day grace period under section 14.3, necessitating that Manager commence an action by June 13, 2019 to obtain a safe harbor.
On appeal, Manager does not attempt to support Supreme Court's rationale. Rather, Manager presents alternative grounds for upholding the court's order based on Owner's purported violations of sections 14.3 and 15.13.
Manager's alternative arguments similarly lack merit. Manager argues that Owner had no right to terminate the HMA until Manager's lawsuit concluded because there was "no deadline" for it to commence an action to obtain a safe harbor under section 14.3. Manager relies on the second sentence of section 14.3, which provides that, "[u]pon initiation of legal proceedings, the non-defaulting party shall only have the right to terminate this Agreement if the court has made a final, non-appealable determination that the alleged act or omission did constitute an Event of Default under this Agreement." Manager correctly points out that this sentence, in isolation, does not contain a deadline to initiate legal proceedings. According to Manager, the time limit expressed in the first sentence of 14.3 is irrelevant because it is a "different part of Section 14.3, which supplies an initial safe-harbor."
Manager misreads section 14.3. It is a cardinal principle of contract construction that a contract should be read as a "harmonious and integrated whole," that every part should be given "effect," and that courts may not "add or excise terms" (Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 581 [2017] [internal quotation marks omitted]). Manager reads the second sentence in a vacuum, ignoring that the "initiation of legal proceedings" refers back to the first sentence regarding timely submission of a bona fide dispute "to the appropriate court of competent jurisdiction." Moreover, Manager's contention that it had no deadline to initiate legal proceedings renders meaningless the time limit expressed in section 14.3(B)(y) which [*5]requires that "such dispute has been submitted to the appropriate court of competent jurisdiction . . . prior to the expiration of the fifteen (15) day (or later) period in (x) above." Read in context, the second sentence entitles the allegedly defaulting party to a safe harbor until "the court has made a final, non-appealable determination" only if the action is timely commenced in accordance with section 14.3(B)(y).
Manager also unpersuasively argues that it "did avail itself of the safe-harbor" because "the bona fide dispute did not arise until [Owner] finally set out its position on August 19, 2019 that [Manager] had not fully cured the purported defaults . . . and [Manager] sued within 15 days thereafter." In accordance with section 14.3(A), a safe harbor requires that "a bona-fide dispute . . . has arisen." Because the HMA does not define bona fide dispute, the term should be given its "plain meaning" (see Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014]). Bona fide is defined as "[m]ade in good faith; without fraud or deceit" and "[s]incere, genuine" (Black's Law Dictionary [11th ed 2019]). Manager does not argue that the dispute was not made in good faith. Rather, it attempts to alter the time limit expressed in 14.3(B)(y) by asserting that the bona fide dispute did not arise until the dispute was "set out" in Owner's August 19, 2019 letter. However, nothing in the HMA provides that a bona fide dispute does not arise until it is described in a particular manner. Manager's unfounded position also renders meaningless the time limit expressed in section 14.3(B)(y) because the time limit "follow[s] the expiration of the cure period" and is unrelated to when Owner "sets out" its position regarding whether Manager has cured the defaults.
Finally, Manager's argument that the complaint was properly dismissed because Owner violated section 15.13 is without merit. Although section 15.13 permits termination of the HMA only in accordance with its express provisions, Manager mischaracterizes Owner's December 17, 2019 termination letter as based solely on Owner's waived "common law rights and powers." Notably, the letter also invoked termination "[u]nder the terms and provisions of Section 14.1 of the Management Agreement." The letter further seeks Manager's compliance with its obligations "as set forth in the Management Agreement" in addition to common law. Nor does Owner's general reference to "common law rights and powers" necessarily violate section 15.13 because section 5.2 of the HMA prohibits resorting to common-law principles "except as expressly provided for in this agreement" (emphasis omitted).
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: December 6, 2022

Footnotes

Footnote 1:The parties' predecessors entered into the HMA in 2012. The agreement was for an initial 25-year term followed by three 10-year extensions at Manager's sole option.

Footnote 2:In the amended complaint, Manager continued to seek damages, including management fees exceeding $26 million, and for the return of its $3.2 million payment.

Footnote 3:As the parties refer to section 14.3's prohibition against termination of the HMA under certain circumstances as a "safe harbor," we will continue to use that term.

Footnote 4:Section 14.1 describes five events of default that entitle Owner to terminate the HMA. Manager does not dispute that the applicable provision at issue here is section 14.1 (e). That provision states that an event of default occurs as a result of "[t]he failure of Manager to perform, keep or fulfill any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, if such failure is not cured within thirty (30) days after written notice specifying such failure is given by Owner to Manager."