22-2971-cv
*Merrill v. Hyman*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18th day of January, two thousand twenty-four.

PRESENT:
> **GUIDO CALABRESI,**
> **ALISON J. NATHAN,**
> > *Circuit Judges.*
> **PAUL A. ENGELMAYER,**
> > *District Judge.**

_____

Suzanne Merrill

> *Plaintiff-Counter-*
> *Defendant-Appellant,*

v.                                                                      **No. 22-2971-cv**

**Kenneth M. Hyman, Dean F. Hyman,**
**Mark S. Hyman, Richard E. Hyman,**

_____

*Judge Paul A. Engelmayer, of the United States District Court for the Southern District of New York, sitting by designation.

*Defendants-Counter-*
*Claimants-Appellees*,

**Frederick L. Hyman,**

> *Defendant-Counter-*
> *Claimant.*

_____

**FOR PLAINTIFF-COUNTER-DEFENDANT-APPELLANT:**

> ROBERT S. BESSER (Clair G. Burrill,
> Clair G. Burrill, P.C., *on the briefs*),
> Santa Monica, CA.

**FOR DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES:**

> MARC J. HERMAN (Ari J. Hoffman, *on
> the brief*), Cohen and Wolf, P.C.,
> Bridgeport, CT.

Appeal from a judgment of the United States District Court for the District of Connecticut (Meyer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Suzanne Merrill appeals from a judgment of the United States District Court for the District of Connecticut (Meyer, *J.*) granting summary judgment to Appellees, the Hymans. Merrill sued the Hymans seeking a declaratory

judgment that, under 17 U.S.C. § 304(c), she could terminate a 1963 agreement between her late husband Bob Merrill, Eliot Hyman, and the Hyman Trusts granting the Hymans certain rights related to Bob Merrill's lyrics for the Broadway musical *Funny Girl*. The precise nature of those rights is at the center of the parties' dispute. The Hymans countersued for breach of contract and tortious interference, and sought a declaratory judgment that Merrill could not terminate the agreement and an injunction prohibiting Merrill from interfering with their receipt of royalties under the agreement. After the parties cross-moved for summary judgment, the district court denied Merrill's motion and largely granted the Hymans' motion (while dismissing one of their claims), holding that the relevant agreement was a royalties agreement that cannot be terminated under 17 U.S.C. § 304(c). We assume the parties' familiarity with the remaining underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision.

"We review de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62

3

F.4th 748, 752 (2d Cir. 2023) (quotation marks omitted). In a contract dispute like this one, summary judgment is generally granted "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). We review questions of contract interpretation *de novo*. *Colon de Mejias v. Lamont*, 963 F.3d 196, 202 (2d Cir. 2020).

Merrill wishes to revoke the agreement in this case through the termination right provided by the Copyright Act under 17 U.S.C. § 304(c). That provision allows a copyright holder or certain heirs to terminate a "grant of a transfer or license of the renewal copyright or any right under it." 17 U.S.C. § 304(c). The Hymans argue that she cannot do so because the agreement does not transfer or license any federal copyright rights. Rather, it is merely a royalties agreement, which cannot be terminated under § 304(c). *See Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 777–78 (2d Cir. 1992) (distinguishing royalty rights from rights under a federal copyright). Merrill does not contest that she could not terminate a royalties agreement, but she argues that the agreement here actually transferred rights under Bob Merrill's copyright—specifically, the "Grand Rights" or dramatic performance rights.

4

The parties' dispute thus boils down to a matter of contract interpretation: When, in 1963, Bob Merrill sold certain rights related to his lyrics, did he sell only the right to receive royalties and other compensation from his lyrics or did he also transfer to Hyman any of his federal copyright rights in the lyrics? We agree with the district court that the 1963 agreement is unambiguously a royalties agreement, and so affirm the court's grant of summary judgment to the Hymans.

Both parties' reliance on New York law in their briefing functions as implied consent for us to apply that law as governing interpretation of the contract in dispute. *See Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000). Under New York law, the words of a contract are given their plain meaning and we read the contract "as a harmonious and integrated whole so as to give effect to its purpose and intent." *HTRF Ventures, LLC v. Permasteelisa N. Am. Corp.*, 141 N.Y.S.3d 17, 21 (N.Y. App. Div. 2021) (internal quotation marks omitted); *see Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014).

The agreement in dispute begins by referring to an earlier contract between Bob Merrill and the production company for *Funny Girl*, in which Merrill and the other authors for the musical gave the company the exclusive right to produce *Funny Girl* in the United States and in Canada in return for various forms of

5

royalties and other compensation. The agreement between Merrill and the Hymans states:

> WHEREAS Merrill has heretofore entered into certain agreements with FUNNY GIRL-JOINT VENTURE and/or the FB Company under which he is to be the lyricist for the musical play entitled "Funny Girl" for which he is to receive royalties, percentage compensation, rights and other compensation in various forms, and
> WHEREAS Merrill desires to sell, deliver and assign to Hyman an undivided two-thirds of his interest in all royalties, percentage compensation, rights and other compensation derived by him from the results and proceeds of any and all services rendered by him in connection with "Funny Girl" with certain exceptions as hereinafter set forth . . .

App'x at 13. The key part of the agreement for purposes of this dispute then repeats the same list of rights and interests when it states that Merrill is selling "an undivided two-thirds of his interest in, to and under his right to receive such royalties, percentage compensation, rights and other compensation, including, but not limited to, all compensation derived from any source whatever in and in connection with 'Funny Girl' . . . ." *Id.*

The plain language of the agreement shows that Merrill was not selling or licensing to Hyman any of his rights under the Copyright Act, but rather some of the financial rights to compensation he had received and would receive by virtue of his copyright rights in the lyrics. The agreement assigns a two-thirds interest

6

in the amounts of payment Merrill receives through royalties and other forms of compensation. It never defines a copyright right that is being transferred or specifies the nature of any license to use the lyrics in a particular way. Nowhere does it state, for example, that Hyman could copy, perform, or adapt the lyrics. *Cf.* 17 U.S.C. § 106 (listing the bundle of exclusive rights in a federal copyright).

The nature of the agreement is further confirmed when it specifies that the rights being sold include two thirds of "payments on account of the sale of motion picture rights . . . , the sale of television rights . . . , [and] phonograph album rights . . . ." App'x at 14. The agreement here does not transfer rights themselves, but rather sells an interest in the payments he is to receive by virtue of those rights. Indeed, the agreement proceeds to refer to all of what Bob Merrill is selling as "payable." App'x at 15. Merrill never explains what two thirds of, say, the right to perform the lyrics would mean or how that could be "payable" in ordinary parlance.

Merrill's only argument is that the list of things sold by Bob Merrill includes the word "rights," which, broadly and literally construed, includes copyright rights. But that makes no sense in context. The word "rights" appears in a list of forms of remuneration Bob Merrill received by virtue of his agreement with the

7

*Funny Girl* production company. The Hymans encourage us to use the interpretive canon *noscitur a sociis* to understand the meaning of "rights" by reference to the other items in the list, including royalties and percentage compensation. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (defining the *noscitur* canon). In fact, we need not resort to any canon. The plain text of the list ends with the catchall term "*other* compensation," which signifies that the preceding items are all forms of compensation. And as the district court pointed out, Merrill's copyright rights were not a form of compensation. They are not something he received as consideration from the production company for his services. Rather, he obtained those rights by virtue of federal copyright law because he created the lyrics.

It is clear from the text of the agreement itself that it did not transfer or license Merrill's copyright in the *Funny Girl* lyrics, or rights under that copyright. Since the contract is unambiguous, we need not (and may not) consider the parties' arguments about extrinsic evidence—let alone separate agreements made years later. *See Ellington*, 21 N.E.3d at 1003.

The district court correctly determined that this was a royalties agreement that sold some of the financial rights to compensation Bob Merrill had received

8

and would receive in connection with his *Funny Girl* lyrics.   As Merrill agrees, she

cannot terminate such an agreement under 17 U.S.C. § 304(c).[1]

\*     \*     \*

Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

[1] Even if Merrill's interpretation of the agreement prevailed, Merrill would still not be entitled to the relief she seeks: an order approving her termination of the grant of royalties to Hyman. On Merrill's interpretation, the most that could be said is that the agreement granted Hyman *both* a copyright right and a right to receive royalties.   Under the Copyright Act, however, Merrill's termination notice would entitle her to terminate only the copyright right, leaving intact the Hymans' right to receive royalties.   *See, e.g.*, *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 168 (1985) (explaining, in the context of the derivative works exception, that "[t]he statutory transfer of ownership of the copyright" through a termination notice under 17 U.S.C. § 304(c) "cannot be fairly regarded as a statutory assignment of contractual rights," like the right to collect royalties from a licensing contract).