| **Aurelius Capital Master Ltd. v Hertz Intl. Ltd.** |
| 2024 NY Slip Op 33795(U) |
| October 21, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 654710/2021 |
| Judge: Jennifer G. Schecter |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY: COMMERCIAL DIVISION

PRESENT:   HON. JENNIFER G. SCHECTER   PART   54

*Justice*

-----------------------------------------------------------------------------------X

AURELIUS CAPITAL MASTER LTD., ARISTEIA CAPITAL L.L.C., BENEFIT STREET PARTNERS L.L.C., FORTRESS INVESTMENT GROUP L.L.C., LYNSTONE SSF HOLDINGS S.A.R.L., PANDORA SELECT PARTNERS L.P., STRATEGIC VALUE DISLOCATION MASTER FUND L.P., STRATEGIC VALUE MASTER FUND LTD., STRATEGIC VALUE SPECIAL SITUATIONS MASTER FUND IV, L.P., TRESIDOR EUROPE CREDIT LIMITED, TRESIDOR EUROPE CREDIT OPPORTUNITIES LIMITED, WHITEBOX GT FUND, L.P., WHIREBOX MULTI-STRATEGY PARTNERS, L.P., WHITEBOX RELATIVE VALUE PARTNERS L.P.,

INDEX NO.   654710/2021

DECISION AFTER TRIAL

Plaintiffs,

- v -

HERTZ INTERNATIONAL LIMITED, HERTZ HOLDINGS NETHERLANDS B.V.,

Defendants.

-----------------------------------------------------------------------------------X

In May 2020, The Hertz Corporation (Hertz USA) filed for bankruptcy in Delaware. Defendants Hertz Holdings Netherlands B.V. (HHN) and Hertz International Limited (HIL) are Hertz USA's subsidiaries. Plaintiffs are holders of the majority of certain notes issued by HHN (the HHN Notes), which Hertz USA guaranteed. Plaintiffs had the right to accelerate the notes due to Hertz USA's bankruptcy. Instead of doing so, they agreed to temporarily waive this event of default while they negotiated a restructuring and financing plan. "Ultimately, the parties settled on the concept of bifurcating the guarantee claims from the HHN Notes themselves and selling them at auction. The auction proceeds would then be used to partially pay down the HHN Notes before they were exchanged into new notes issued by HHN" (Dkt. 613 at 5).

On November 30, 2020, plaintiffs entered into two agreements with defendants: (1) a Lock-up Agreement (Dkt. 387 [the LUA]); and (2) a Backstop Agreement (Dkt. 388 [the Backstop]).

The LUA contemplated, among other things: (1) issuance of €250 million of new notes by HIL (the New HIL Notes) to holders of the HHN Notes, (2) seeking an order in the U.S. bankruptcy allowing an unsecured claim against the debtors as guarantors of the HHN Notes in an amount equal to the outstanding amount of the HHN Notes, which would be

# OTHER ORDER – NON-MOTION

[* 1]

bifurcated from the HHN Notes and sold through an auction to qualified investors, and that the sale proceeds would be paid to the holders of HHN Notes to reduce the amount of the HHN Notes, (3) an exchange of the HHN Notes for two series of new notes to be issued by HHN, and (4) the implementation of certain of these steps through a scheme of arrangement under English law. The LUA contains various Transaction Milestones, culminating with the sale of the US Guarantee claims by February 12, 2021 (Dkt. 387 at 65).

The Backstop contemplated that plaintiffs would purchase up to €250 million in New HIL Notes by a Restructuring Effective Date of March 31, 2021. Section 3(b) provides, however, that plaintiffs would be entitled to a 5% Alternative Financing Premium (AFP) "if, on or prior to the Restructuring Effective Date, HIL and/or the Company (or any of their respective affiliates) ... raises, **or commits to raise**, any new debt or equity financing from any Alternative Financing Provider in lieu of issuing all or any portion of the New HIL Notes" (Dkt. 388 at 5 [emphasis added]). Plaintiffs would not be entitled to the AFP though "if any condition to the occurrence of the Restructuring Effective Time under the Lock-up Agreement **can no longer be satisfied** (other than, in each case, as a result of a failure of the Debtors to comply with their obligations under this New HIL Notes Backstop Agreement or the Lock-up Agreement) as a result of which it will **no longer be possible** to implement the Scheme Transaction" (*id.* [emphasis added]).

On November 30, 2020, in accordance with the LUA, Hertz UK Receivable Ltd.--an indirect subsidiary of defendants and Hertz USA--commenced a scheme of arrangement in the United Kingdom. On December 23, 2020, the US debtors filed a motion for approval of the proposed bifurcation and set a hearing date of January 13, 2021 in the US bankruptcy proceedings (*see* Dkt. 389). The hearing was adjourned multiple times. Ultimately, the bifurcation motion was withdrawn because Alternative Financing was secured. Indeed, it was clear that bifurcation would no longer be needed by March 2, 2021, when Hertz USA filed a Chapter 11 plan whereby "the plan sponsors were willing to purchase the guarantee claims for $553,073,500" (Dkt. 639 at 10; *see* Dkt. 471; *see also* Dkt. 470 at 16 ["the Plan, in conjunction with an English scheme of arrangement, provides for (a) the allowance of an Unsecured Funded Debt Claim in respect of the Debtors' guarantee of certain notes (the HHN Notes) in the amount of $790 million; (b) the purchase of such Claim by the Plan Sponsors or the payment of such Claim under the Plan, in either case, for a cash payment equal to 70% of such claim (approximately $553 million); (c) the use of the proceeds paid in respect of such claim to pay down the HHN Notes; and (d) the issuance of €250 million in new notes to be issued by Hertz International Ltd., a direct subsidiary of Hertz Corp. and the parent of HHN"], 66; Dkt. 635, Tr. at 128:6-15). The credible evidence at trial revealed that defendants were committed to such Alternative Financing and had their ducks in a row before the end of March 2021, though agreements were not officially finalized until April 3, 2021, when HIL executed a commitment letter providing a €250 million facility with other lenders (Dkt. 639 at 10-14; *see* Dkt. 439 at 28 [Debtors explaining in their March 29, 2021 motion that "both groups of potential plan sponsors have indicated that they would

provide the HIL Facility and that they would likely repay such financing on the effective date of the Plan with proceeds from the Debtors anticipated term loan exit financing" and that "the HIL Facility would be made in connection with the European Restructuring"]). With this understanding, plaintiffs terminated the LUA on March 30, 2021.

The parties dispute whether plaintiffs are entitled to the AFP. A bench trial was held in March 2024 (Dkts. 635-637), after which the parties filed post-trial briefs (Dkts. 638, 639). The court finds that plaintiffs are entitled to the AFP because defendants committed to raise alternative financing before March 31, 2021, and it was not impossible to perform the parties' agreements by their terms (*see* Dkt. 258 at 1 ["This isn't about shopping for an alternative w/in confines of this deal. If we do that, then its w/your guys. It's about what happens if this deal can't happen (i.e. we can't get bifurcation order) - we can't be bound to pay where the HIL notes can't actually be issued to do the deal"]). The choice that defendants made--to pursue and materially agree on less-costly alternative financing in lieu of performing under the parties' binding agreements--obligated them to pay plaintiffs the AFP (*see* Dkt. 375 at 1 [LUA/Backstop deal provides liquidity needed to continue European business "with upfront financing that we believe is reasonably priced and that can be taken out if cheaper financing is available from a plan sponsor or the market"]; *see also* Dkt. 637, Tr. at 308).

The court finds that, in the Backstop, the parties did not intend "commits to raise" to require actual entry into an enforceable legal obligation or execution of a binding contract. Based on the plain meaning of the language that the parties themselves chose to use, in its context, the court finds that they intended that the AFP would be owed if defendants committed, in the colloquial sense, to pursuing and using alternative financing, which the evidence unquestionably proves they did prior to March 31, 2021 (*see, e.g.*, Dkt. 637, Tr. at 297 [Hertz USA Board authorized pursuit of "definitive documentation" for alternative financing], 308-12).

The court is unpersuaded by defendants' expert's analysis of the terms of other deal documents, since there is no credible evidence that the parties understood or intended that their bespoke language was informed by words used in other deals. "All Professor Morrison did was a survey, and ... he could not find *any* backstop agreement that used the phrase 'raises, or commits to raise,' or even just 'commits to raise' (or 'raises')" (Dkt. 639 at 20).

Under these circumstances, defendants' evidence of custom and usage is uncompelling and indeed inadmissible (*see Reuters Ltd. v Dow Jones Telerate, Inc.*, 231 AD2d 337, 343 [1st Dept 1997] ["One who seeks to use trade usage to define language or annex a term to a contract must show either that the other party to the contract **is actually aware of the usage**, or that the existence of the usage in the business to which the transaction relates **is so notorious** that a person of ordinary prudence in the exercise of reasonable care would

[* 3]

be aware of it"] [emphasis added], *accord J.P. Morgan Inv. Mgt. Inc. v AmCash Group, LLC*, 106 AD3d 559, 559-60 [1st Dept 2013]; *see also Executive Off. Network, Ltd. v 666 Fifth Ave. Ltd. Partnership*, 294 AD2d 166, 168 [1st Dept 2002] ["Industry custom affords no assistance where it is unclear whether the intention was to follow it or to depart from it"]). There was no credible evidence that the parties were aware that "commits to raise" had an understood industry meaning. The evidence cited by defendants about plaintiffs' purported understanding is unpersuasive (*see* Dkt. 638 at 27-29). Nor is there any evidence that a person of ordinary prudence in the exercise of reasonable care would be aware of such meaning. The court therefore agrees with plaintiffs that "there is thus no custom and usage for the meaning of this language" (Dkt. 639 at 20).

Given the parties' sophistication, they must be held to the plain meaning of the words they selected to use in their contract (*see Ellington v EMI Music, Inc.*, 24 NY3d 239, 244 [2014]). And since the evidence shows that defendants committed to raise alternative financing before March 31, 2021, that they executed the contracts governing that financing a few days later does not negate plaintiffs' entitlement to the AFP (*see* Dkt. 639 at 22 ["By (a) seeking the Bankruptcy Court's approval of an agreement that obligated a plan sponsor to provide the HIL Facility and prohibited Defendants from consummating the Restructuring (or even negotiating about it); (b) filing a Chapter 11 Plan, of which the HIL Facility was a component; (c) filing a disclosure statement that unequivocally provided that 'the Plan Sponsors would provide HIL with the HIL Facility,' []; and (d) receiving signed commitment letters in respect of that HIL funding... Hertz 'commit[ted] to raise' Alternative Financing prior to the termination, within the meaning of Clause 3(b)"]).

Thus, to avoid their obligation to pay the AFP, defendants must prove that one of the exceptions to § 3(b) apply. They have not done so.

The court does not find that the Bifurcation Order was a condition to the occurrence of the Restructuring Effective Time that could no longer be satisfied. The court agrees with plaintiffs' view of the evidence (*see* Dkt. 639 at 23-27). Simply put, "defendants believed that a hearing on the Bifurcation Motion was a 'risk' ... but a 'risk' is not a condition that 'can no longer be satisfied'" and since "Hertz made a business choice to abandon the Bifurcation Order" it is impossible to know whether the bankruptcy court would have approved the Bifurcation Order (*id*. at 27). Even if the evidence suggests that approval was unlikely, proof of a low level of probability is insufficient to establish that the condition could "no longer be satisfied." The parties bargained for a standard tantamount to impossibility, which has not been proven on this record.

Nor does the court find that, as a result of a failure to obtain the Bifurcation Order, it was no longer possible to implement the Scheme Transaction. Again, the court must hold defendants to the difficult-to-prove "no longer possible" standard to which they agreed. And since the court, again, agrees with plaintiffs' view of the evidence (*see id*. at

28-30), the court concludes that the Scheme Transaction remained possible even without the Bifurcation Order (*id.* at 30). Plaintiffs are therefore entitled to the AFP.

In light of these conclusions, there is no need to reach plaintiffs' other arguments based on defendants' alleged failure to comply with their obligations under the LUA (*see id.* at 30-34).

Defendants' other arguments are unavailing.

Accordingly, it is ORDERED that by October 31, 2024, the parties shall confer, prepare and file a joint proposed order or competing proposed orders (along with a redline and a joint letter explaining their disagreements) directing the Clerk to enter judgment in favor of plaintiffs, and a Word version of the order(s) shall be emailed to the court.

20241021204717JSCHECTE95CBB4A33924402086277ECD3309BE28

DATE: **10/21/2024**

_____

**JENNIFER G. SCHECTER, JSC**

[* 5]